Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CHENYU WANG, derivatively on behalf of NEXTDOOR HOLDINGS, INC. (F/K/A) KHOSLA VENTURES ACQUISITION CO. II,

Plaintiff,

vs.

SARAH J. FRIAR, MICHAEL DOYLE, VINOD KHOSLA, SAMIR KAUL, PETER BUCKLAND, DMITRI SHKLOVSKY, ANITA SANDS, ENRICO GAGLIOTI, JOHN HOPE BRYANT, J. WILLIAM GURLEY, LESLIE KILGORE, MARY MEEKER, JASON PRESSMAN, DAVID SZE, NIRAV TOLIA, CHRIS VARELAS, ANDREA WISHOM, and KHOSLA VENTURES SPAC SPONSOR II LLC,

Defendants,

and

NEXTDOOR HOLDINGS, INC. (F/K/A) KHOSLA VENTURES ACQUISITION CO. II,

Nominal Defendant.

Case No.:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Verified Shareholder Derivative Complaint

# INTRODUCTION

Plaintiff Chenyu Wang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Nextdoor Holdings, Inc. ("Nextdoor" or the "Company") f/k/a Khosla Ventures Acquisition Co. II ("KV Acquisition Company II")[1], files this Verified Shareholder Derivative Complaint against Defendants Samir Kaul ("Kaul"), Peter Buckland ("Buckland"), Vinod Khosla ("Khosla"), Dmitri Shklovsky ("Shklovsky"), Anita Sands ("Sands"), Enrico Gaglioti ("Gaglioti") and Khosla Ventures SPAC Sponsor II LLC (the "Sponsor") (collectively, the "KV Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Sarah J. Friar ("Friar"), Michael Doyle ("Doyle"), John Hope Bryant ("Bryant"), J. William Gurley ("Gurley"), Leslie Kilgore ("Kilgore"), Mary Meeker ("Meeker"), Jason Pressman ("Pressman"), David Sze ("Sze"), Nirav Tolia ("Tolia"), Chris Varelas ("Varelas"), and Andrea Wishom ("Wishom") (collectively with Defendants Kaul, Buckland, Khosla, Shklovsky, Sands, and Gaglioti, the "Individual Defendants," and Nextdoor, together with the Individual Defendants, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Bryant, Kilgore, Meeker, Pressman, Sze, Varelas, Wishom, Doyle, Friar, Gurley, and Tolia (collectively, the "Legacy Nextdoor Defendants") for aiding and abetting the KV Defendants' breaches of fiduciary duty; and against Defendant Sponsor and Defendants Friar, Doyle, Khosla, Kaul, and Buckland for contribution under Sections 10(b) and 21D of the

---

[1] "Nextdoor" refers to the Company after the November 2021 Merger (defined below) and name change, whereas "KV Acquisition Company II" refers to the Company prior to the Merger and name change.

Exchange Act. As for Plaintiff's complaint against the Individual Defendants and Defendant Sponsor, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nextdoor and KV Acquisition Company II, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former directors and officers from July 6, 2021, through November 8, 2022, both dates inclusive (the "Relevant Period").

2.      Nextdoor offers a digital platform that purportedly enables users to build an engaged community of trusted neighbors, businesses and public services that can be depended on to exchange valuable information, goods, and services. The platform, among other things, allows users to interact with posts, photos, and discussions in their "feeds;" discover local businesses and interact with them; leave recommendations; buy, sell, and give away items; and peddle neighborly services, such as dog walking.

3.      Like other social media and technology companies, Nextdoor's business model utilizes the unique local data sets gathered from the platform's users, including demographic data, interests, and user behaviors by supplying real-time local data to businesses so that businesses can devise advertising strategies and engage in targeted advertising. To this end, Nextdoor's platform features a library of ad formats, including sponsored posts and lead generation, which feature combinations of text (static or

2

dynamic), images (including static and animated), and URL links, allowing advertisers to purchase and deliver ads across the platform.

4.      The Company is the result of a merger that closed on November 5, 2021 (the "Merger") with Nextdoor, Inc. ("Legacy Nextdoor"), a private company founded in 2007 by Defendant Tolia, Sarah Leary and Prakash Janakiraman along with founding investor Defendant Gurley. Legacy Nextdoor sought to "cultivate a kinder world where everyone has a neighborhood they can rely on" through a mission to be "the neighborhood hub for trusted connections and the exchange of helpful information, goods, and services."

5.      Legacy Nextdoor changed its name in March 2019 to Nextdoor, Inc. from Nextdoor.com, Inc. Upon completion of the Merger, the Company took on the operations of Legacy Nextdoor's business as its own.

6.      KV Acquisition Company II previously operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a brief defined life span formed for the sole purpose of effecting a merger, or "business combination," with a privately held business to enable the privately held business to go public.[2]

7.      For this reason, SPACs generally raise funds from investors through an IPO and then use the proceeds from the IPO to fund the acquisition of a business from a private company. Because of this opaque process, investors heavily rely on a SPAC's officers and directors to uphold their fiduciary duties of using their skills, being transparent, and making honest disclosures in all public statements and regulatory filings about the use of a SPAC's IPO proceeds for the acquisition of attractive private businesses.

---

[2] Commonly referred to as "blank check companies," SPACs are shell companies formed to raise capital to acquire an existing private company. In recent years, SPACs have exploded in popularity, and are often used by financial industry insiders to bypass the traditional initial public offering ("IPO") process which can be lengthy and expensive.

Verified Shareholder Derivative Complaint

8.     KV Acquisition Company II was incorporated in Delaware on January 29, 2021. Leading up to the Merger (defined further below), KV Acquisition Company II represented to investors that it was specifically seeking a private company with a "large market opportunity" that boasted a "highly differentiated" proprietary technology to take public.

9.     KV Acquisition Company II's sponsor, Defendant Sponsor (Khosla Ventures SPAC Sponsor II LLC) was a Delaware limited liability company; KV Acquisition Company II's Chief Executive Officer ("CEO") was Defendant Kaul, who also served as the Chairman of the Board of Directors (the "Board") and as a director; KV Acquisition Company II's Chief Financial Officer ("CFO"), Chief Operating Officer ("COO") and Treasurer and Secretary was Defendant Buckland; and Defendants Shklovsky, Sands and Gaglioti served as directors.

10.     On January 29, 2021, Defendant Sponsor purchased 10,000,000 founder shares of KV Acquisition Company II for an aggregate purchase price of $25,000, consisting of 5,000,000 Class B founder shares and 5,000,000 Class K founder shares ("Founder Shares") for the benefit of Defendant KV LLC (a venture capital firm owned and controlled by Defendants Khosla, Kaul, and Buckland) and Defendants Khosla, Kaul, and Buckland, who owned and controlled Defendant Sponsor.[3] Defendant Khosla was the managing member of Defendant Sponsor.

11.     Prior to the IPO, which was held on March 26, 2021, Defendant Sponsor transferred 40,000 Founder Shares to each of Defendants Shklovsky, Sands and

---

[3]All Class B Founder Shares would automatically convert into an aggregate of 7,347,249 shares of KV Acquisition Company II Class A common stock following the completion of an initial business combination. Prior to an initial business combination, only holders of shares of KV Acquisition Company II Class B common stock were entitled to vote on the appointment of directors. All KV Acquisition Company II Class K founder shares would convert into an aggregate of 3,061,354 shares of the newly formed company's Class A common stock following the completion of an initial business combination.

4

Verified Shareholder Derivative Complaint

Gaglioti, who were considered the independent directors on the KV Acquisition Company II Board at the time.

12. However, as the Founder Shares did not entitle Defendants Khosla, Kaul, Buckland, Shklovsky, Sands and Gaglioti to redemption rights, the Founder Shares would have been worthless to them if KV Acquisition Company II failed to timely complete a business combination by March 26, 2023. Additionally, since Defendant Sponsor was owned and controlled by Defendants Khosla, Kaul, Buckland, and KV LLC, and since Defendants Shklovsky, Sands and Gaglioti, together, represented a majority of KV Acquisition Company II's Board, Defendants Khosla, Kaul, Buckland, Shklovsky, Sands and Gaglioti were all significantly interested in effectuating any business combination by dint of their ownership and control of Defendant Sponsor, or else risked losing out on their respective windfalls from the Founder Shares, which, in the aggregate, ***totaled more than $103 million***.[4]

13. KV Acquisition Company II undertook its IPO on March 26, 2021, offering 40,000,000 shares of Class A common stock at $10.00 per share for gross proceeds of $400 million, excluding costs. That same day, KV Acquisition Company II's underwriters exercised their option to purchase an additional 1,634,412 shares from KV Acquisition Company II at a price of $10.00 per share less the underwriting discount. Thus, in total, KV Acquisition Company II sold 41,634,412 shares for total proceeds exceeding $416 million in connection with its IPO.

14. Simultaneously with the closing of the IPO, KV Acquisition Company II consummated the private placement of 1,100,000 private placement shares at a price of $10.00 per private placement share to Defendant Sponsor (the "Private Placement"), generating proceeds of $11,000,000. In connection with the underwriters' partial exercise of their over-allotment option, KV Acquisition Company II also consummated

---

[4] This figure is based upon the $10.13 closing price of the Company's common stock on September 29, 2021, the most recent date before the issuance of the prospectus issued in connection with the Merger.

the sale of an additional 32,688 private placement shares at $10.00 per private placement share (the "Additional Private Placement," and together with the Private Placement, the "Private Placements"), generating additional proceeds of $326,880. In total, KV Acquisition Company II obtained $11,326,880 in gross proceeds from the sale of shares in the Private Placements.[5] Like the Founder Shares, the Private Placements' shares would have expired worthless if KV Acquisition Company II failed to timely complete a business combination, as the Private Placements' shares did not entitle the KV Defendants to redemption rights.

15.   Following the closing of the IPO on March 26, 2021, and the closing of the underwriters' exercise of their overallotment option on March 30, 2021, an amount of $416,334,120 ($10 per share) of the proceeds from the IPO, including $14,572,044 of the underwriters' deferred discount, was placed in a U.S.-based Trust Account at Goldman Sachs, maintained by Continental Stock Transfer & Trust Company, LLC, acting as trustee (the "Trust").

16.   The funds held in the Trust were to be released only upon the closing of a qualifying business combination, or in the case of liquidation, to return the funds to KV Acquisition Company II's investors. The Trust was established to safeguard two key rights held by KV Acquisition Company II shareholders under KV Acquisition Company II's Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"): (1) the right to redeem their shares at $10.00 per share price instead of investing in the business combination; and (2) in the event  KV Acquisition Company II was unable to timely complete a business combination, the right to receive a return of all IPO proceeds.

17.   Unbeknownst to the shareholders who approved the Merger, (i.e., KV Acquisition Company II's shareholders), the value of the Merger was not in line with the Individual Defendants' representations. In fact, through the Merger, KV Acquisition

---

[5] As of June 30, 2021.

Verified Shareholder Derivative Complaint

Company II inherited a business that was benefitting from unique macroeconomic conditions, including COVID-19, that would be short-lived, that would not allow Nextdoor to maintain "hyper growth" for "multiple years," and, ultimately, offered little in the way of financial growth or success. Indeed, the Individual Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at KV Acquisition Company II and Legacy Nextdoor to the Company's detriment. The full truth remained hidden from investors for more than a year after the Merger closed. When the truth finally emerged, the value of the Company's securities tanked to new lows.

18.     However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placements' shares, their financial interests were misaligned with those of KV Acquisition Company II shareholders. These conflicts of interest only worsened once KV Acquisition Company II determined it would complete a business combination with Legacy Nextdoor. Pursuant to KV Acquisition Company II's Certificate of Incorporation, KV Acquisition Company II had only 24 months from the date of the IPO's closing, or until March 26, 2023, to complete a business combination. This meant that, in the event KV Acquisition Company II failed to complete a business combination by that time, KV Acquisition Company II would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to KV Acquisition Company II's investors. Because each of KV Acquisition Company II's officers and directors[6] agreed to waive their rights to liquidate distributions from the Trust, the $416.3 million in Founder Shares and Private Placements' shares would have been rendered worthless to them in the event KV Acquisition Company II failed to timely complete a business combination.

---

[6] Defendants Khosla, Kaul, Buckland, Shklovsky, Sands and Gaglioti.

Verified Shareholder Derivative Complaint

19. Driven by their strong motivations to avoid liquidation of the Trust and quickly cash out on their investments, the Individual Defendants affiliated with KV Acquisition Company II were highly motivated to facilitate a business combination with just about any company. Despite having two years from the closing date of the IPO to find an acceptable suitor, the KV Defendants—within twenty-five days of the IPO—decided to pursue a merger with Legacy Nextdoor, a company run by Defendant Friar, an acquaintance of Defendant Khosla and David Weiden (a managing director of KV LLC) after holding meetings with the management team of *just one* other prospective private company.

20. Between July 6, 2021 and November 5, 2021, KV Acquisition Company II and its advisors repeatedly represented that they had conducted "extensive" due diligence of Legacy Nextdoor in anticipation of the proposed Merger. In reality, KV Acquisition Company II's due diligence of Legacy Nextdoor was glaringly inadequate, as it unreasonably failed to: (1) investigate and confirm Legacy Nextdoor's claims about having a total addressable market of 312 million households; (2) investigate the unique impact COVID-19 had on Legacy Nextdoor's growth trends, including how Legacy Nextdoor's future advertising growth would be hampered by the rapid growth brought on by COVID-19; (3) investigate and confirm that Legacy Nextdoor's growth trends were already reversing by July 2021; (4) investigate and confirm that the U.S. market—Legacy Nextdoor's most important market—was already oversaturated; and (5) investigate and confirm Legacy Nextdoor's revenue trajectory and guidance.

21. This information was highly material to investors. The Company's business model relies upon vital metrics such as average revenue per weekly active user ("ARPU")—defined as total revenue in a certain geographic area during a period divided by the average of the number of Weekly Active Users ("WAUs") in the specified geographic area during the same period—which Legacy Nextdoor claimed would continue to facilitate "hyper growth" for "multiple years." Unbeknownst to the

investing public, however, Legacy Nextdoor benefitted tremendously from the unique macroeconomic implications of COVID-19 lockdowns and related societal behavior, and as a result, Legacy Nextdoor's rapid growth would not be sustainable and was, in fact, reversing by July 2021.

22.     Nevertheless, on July 6, 2021, Legacy Nextdoor and KV Acquisition Company II issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which a wholly owned subsidiary of KV Acquisition Company II, Lorelei Merger Sub Inc. ("Merger Sub"), would merge with and into Legacy Nextdoor, with Legacy Nextdoor surviving as a wholly owned subsidiary of KV Acquisition Company II. Upon closing of the Merger, KV Acquisition Company II would be renamed Nextdoor and would be listed under the ticker symbol "KIND" on the NYSE.

23.     The parties had entered into the Merger Agreement within four months of KV Acquisition Company II's IPO. The Individual Defendants continued to act fast to both ensure that KV Acquisition Company II shareholders would approve the proposed Merger and dissuade them from redeeming their shares—presumably before Legacy Nextdoor's wave of tremendous growth from the COVID-19 pandemic crashed ashore.

24.     To accomplish these goals, during the Relevant Period, certain of the Individual Defendants caused KV Acquisition Company II and Legacy Nextdoor to tout a series of materially false and misleading statements and omissions regarding Legacy Nextdoor and the post-Merger company's business and prospects. These statements were made in SEC filings, press releases, interviews, and other public communications and misled the investing public about: (1) Nextdoor having a total addressable market of 312 million households; (2) the unique impact COVID-19 had on Legacy Nextdoor's growth trends, including how Nextdoor's future advertising growth would be hampered by the growth brought on by COVID-19; (3) the reversal of Legacy Nextdoor's growth trends by July 2021; (4) the U.S. market—Nextdoor's most important market—was

9

Verified Shareholder Derivative Complaint

oversaturated before the Merger; (5) Nextdoor's revenue trajectory and guidance were materially overstated; and (6) the adequacy of KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger.

25. These matters directly impacted the Company's growth abilities, revenue projections, and, as a result, the share price of the post-Merger Company's stock. Indeed, information regarding the true state of Legacy Nextdoor was material to KV Acquisition Company II shareholders in deciding whether to redeem their shares of KV Acquisition Company II stock or invest in the post-Merger Company. Even so, throughout the Relevant Period, the Individual Defendants misled KV Acquisition Company II shareholders as to the true state of Legacy Nextdoor (and the potential benefits of investing in the post-Merger Company) to garner shareholder approval for the Merger.

26. The Company filed a registration statement in connection with the proposed merger on July 20, 2021, on Form S-4 with the SEC (the "Form S-4"), which was subsequently amended on September 9, 2021 (the "Amended Form S-4"), October 1, 2021 (the "Second Amended Form S-4"), October 13, 2021 (the "Third Amended Form S-4"), and October 18, 2021 (the "Fourth Amended Form S-4") (collectively, the "Registration Statement"), followed by a joint prospectus and proxy statement on Form 424B3 filed on October 21, 2021 (the "Merger Proxy Statement," and together with the Registration Statement, the "Offering Documents").

27. The Merger Proxy Statement was solicited by the Board of KV Acquisition Company II, including Defendants Kaul, Shklovsky, Sands, and Gaglioti, who, as disclosed in the Merger Proxy Statement, approved the Merger Agreement "after careful consideration" and recommended that KV Acquisition Company II shareholders approve, among other things, the Merger and the 2021 Equity Incentive Plan (the "2021 Plan").

28. Moreover, the Merger Proxy Statement specifically also overstated Legacy

Nextdoor's value, failed to disclose material issues concerning certain of the Individual Defendants' interest in the Merger, failed to disclose the value of Founder Shares and Private Placements' shares held by Company insiders, including Defendants Kaul, Buckland, Khosla, Shklovsky, Sands, and Gaglioti.

29. The truth about Nextdoor began to emerge on March 1, 2022, when the Company issued a press release revealing Nextdoor's financial results for the fourth quarter and full year ending December 31, 2021 (the "2021 Fiscal Year"), the quarter during which the Merger closed. The press release reported, in contradiction of the Individual Defendants' representations about Nextdoor's continuing accelerated growth trends, that Nextdoor's revenue growth rate in the fourth quarter had fallen by 18% to 48% year-over-year growth, which was significantly less than the 66% growth rate before the Merger was approved at the November 2, 2021 special meeting of shareholders. The press release additionally reported quarterly ARPU of $1.65, revealing that Nextdoor's ARPU growth rate in the fourth quarter had significantly fallen by 26% to weak 12% year-over-year growth from 38% growth in the third quarter of the 2021 Fiscal Year—indicative of Nextdoor's inability to monetize the platform.

30. On this news, the Company's share price dropped $0.85 (or 14%) from a close of $6.24 per share on March 1, 2022, to a close of $5.39 per share on March 4, 2022.

31. Later, on November 8, 2022, the truth fully emerged when the Company filed its quarterly report on Form 10-Q with the SEC for the period ending September 30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q revealed that the Company's business continued to crumble every quarter since the Merger. Indeed, the Q3 2022 10-Q revealed that the Company's revenues during the third quarter of the 2022 Fiscal Year[7] fell by $1 million to $54 million, constituting 2% year-over-year growth, and that Nextdoor's quarterly ARPU growth was becoming even more negative, shrinking by

---

[7] The fiscal year ending on December 31, 2022.

11

Verified Shareholder Derivative Complaint

12% when compared to the prior year's third quarter.

32.    During an earnings conference call held that same day to discuss the financial results, Defendant Doyle revealed that the Company would reduce revenue guidance again by another $12 million, and further warned investors that the Company now anticipated that 2022 Fiscal Year revenues would total only $210.5 million at the midpoint, a figure significantly less than the $256 million figure represented by the Individual Defendants during the Relevant Period.

33.    On this news, the Company's share price dropped $0.26 (or 11%) from a close of $2.32 per share on November 8, 2022 to a close of $2.06 per share on November 9, 2022.

34.    On February 28, 2024, based on these massive losses from the Individual Defendants misconduct, a class of Nextdoor shareholders initiated a securities class action, against Nextdoor, the Sponsor, KV LLC, and Defendants Friar, Doyle, Khosla, Kaul, and Buckland in the United States District Court for the Northern District of California alleging violations of the Exchange Act (the "Securities Class Action").

35.    As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy Statement and statements leading up to the close of the transaction, shareholders were deceived into approving the unfavorable Merger instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of Legacy Nextdoor, and significant conflicts of interest which ultimately harmed the Company and its investors and squandered funds secured in the Trust (collectively, the "Overpayment Misconduct").

36.    The Individual Defendants and the Sponsor further breached their fiduciary duties and engaged in other misconduct to the Company's detriment and/or aided and abetted the same by engaging in, allowing and/or facilitating the Overpayment Misconduct and related misconduct.

Verified Shareholder Derivative Complaint

37. Also, during the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Nextdoor to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2022 and September 2022, approximately 23,251,703 shares of Nextdoor's common stock were repurchased, costing the Company over ***$77.2 million***.[8] As the Company's stock was actually only worth $2.06 per share, the price at which it was trading when markets closed on November 9, 2022, the Company overpaid for repurchases of its own stock by ***over $40 million*** in total.

38. In light of the Individual Defendants' misconduct, which has destroyed the value of the Company, subjected the Company to costly investigations, the Securities Class Action, which names Legacy Nextdoor's President, CEO, and a director, and Nextdoor's former CEO, President and Chairperson, Legacy Nextdoor's former CFO, a founder and CEO of KV Acquisition Company II, and the COO, CFO, and Treasurer and Secretary of KV Acquisition Company II as defendants—the Company has expended and will have to expend many millions of dollars.

39. Since Plaintiff initiated this action on July 24, 2024, the Company's stock has been trading under $2.86, representing just how destructive the Merger was.

40. In light of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

---

[8] All emphasis is added unless otherwise noted.

Verified Shareholder Derivative Complaint

because Plaintiff's claims raise a federal question under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

42.	This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

43.	Venue is proper in this District because Nextdoor's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

44.	Plaintiff is a current shareholder of Nextdoor. Plaintiff has continuously held Nextdoor common stock at all relevant times.

### Nominal Defendant Nextdoor

45.	Nextdoor is a Delaware corporation with principal executive offices at 420 Taylor Street, San Francisco, CA 94102. Nextdoor's common stock trades on the NYSE under the ticker symbol "KIND." Nextdoor's stock is currently trading at under $2.86 per share.

### Defendant Friar

46.	Defendant Friar served as the CEO and President of Nextdoor from the Merger until she resigned from those positions on May 8, 2024. She also served as a Company director and as the Chairperson of the Board from the Merger until March 29, 2024. Prior to the Merger, she served as Legacy Nextdoor's CEO and President, as a director from December 2018 until the Merger. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 26, 2024 (the "2024 Proxy

14

Verified Shareholder Derivative Complaint

Statement"), as of March 31, 2024, Defendant Friar beneficially owned 1,442,866 shares of Company Class A common stock and 18,786,659 shares of Company Class B common stock. Through her holdings, she held 8.45% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Friar beneficially owned approximately $3.2 million worth of Nextdoor Class A common stock as of that date.

47.    For the 2021 Fiscal Year, Defendant Friar received $20,110,434 in total compensation from the Company, including $350,000 in salary, and $19,760,434 in option awards. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Friar received $8,345,638 in total compensation from the Company, including $367,708 in salary, $75,000 in bonuses, $7,878,714 in option awards, and $24,216 in all other compensation.

48.    The 2024 Proxy Statement stated the following about Defendant Friar:

Sarah Friar has served as our Chief Executive Officer and President since November 2021. Ms. Friar served as Nextdoor, Inc.'s Chief Executive Officer and President and as a member of Nextdoor, Inc.'s Board of Directors from December 2018 until November 2021. Ms. Friar will resign as the Chief Executive Officer, President, effective as of the Transition Date. Prior to joining Nextdoor, Inc., Ms. Friar served as the Chief Financial Officer at Block, Inc. (Square), a financial technology company, from July 2012 to December 2018, Senior Vice President of Finance & Strategy at salesforce.com, inc., a customer relationship management technology company, from April 2011 to July 2012, and Lead Software Analyst and Business Unit Leader at Goldman Sachs, a multinational investment bank, from 2000 to April 2011. She currently serves on the board of directors for Walmart Inc. Ms. Friar previously served on our Board of Directors from November 2021 to March 2024 and the board of directors of Slack Technologies, Inc., Dragoneer Growth Opportunities Corp., Dragoneer Growth Opportunities Corp. II, Dragoneer Growth Opportunities Corp. III and New Relic, Inc. Ms. Friar holds a M.Eng. from the University of Oxford and an M.B.A. from Stanford University Graduate School of Business.

**Defendant Doyle**

49.     Defendant Doyle served as Nextdoor's CFO and Treasurer from the Merger until he resigned from his position on November 7, 2023. Previously, he served as Legacy Nextdoor's CFO from August 2018 until the Merger. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Doyle beneficially owned 45,388 shares of Company Class A common stock. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Doyle beneficially owned approximately $102,123 worth of Nextdoor Class A common stock as of that date.

50.     For the 2021 Fiscal Year, Defendant Doyle received $2,444,463 in total compensation from the Company, including $350,000 in salary and $2,094,463 in option awards. For the 2022 Fiscal Year, Defendant Doyle received $2,175,010 in total compensation from the Company, including $367,708 in salary, $75,000 in bonuses, $1,730,002 in option awards, and $2,300 in all other compensation.

51.     The Company's Schedule 14A with the SEC on April 17, 2023 (the "2023 Proxy Statement") stated the following about Defendant Doyle:

> Michael Doyle has served as our Chief Financial Officer and Treasurer since November 2021. Previously, Mr. Doyle served as Nextdoor, Inc.'s Chief Financial Officer from August 2018 until November 2021. Before joining Nextdoor, Inc., Mr. Doyle served as Chief Financial Officer at Despegar.com, Corp., a Latin American travel agency, from June 2013 to August 2018. He was also Chief Financial Officer at eLong, Inc., a Chinese online travel agency, the Asia Pacific region of Expedia Group, Inc., an online travel agency, and Teledesic, LLC, a commercial broadband satellite internet company. Mr. Doyle earned a B.B.A. in Finance and Real Estate from Southern Methodist University and an M.B.A. from Harvard Business School.

**Defendant Khosla**

52.     Defendant Khosla founded KV Acquisition Company II. He was one of the three managing members of Defendant Sponsor.

**Defendant Kaul**

16

Verified Shareholder Derivative Complaint

53.     Defendant Kaul served as the CEO, the Chairperson, and the President of KV Acquisition Company II from May 28, 2019 until the Merger and as a director of KV Acquisition Company II from January 2021 until the Merger. He also has been a General Partner of KV LLC since 2006, a venture capital firm founded by Defendant Khosla.

54.     The Merger Proxy Statement stated the following about Defendant Kaul:

Samir Kaul. Mr. Kaul has served as a member of our Board since January 2021. Mr. Kaul has been a General Partner at Khosla Ventures, a venture capital firm, since February 2006 and currently serves on the boards of directors of several private and public companies, including Guardant Health and Jack Creek Investment Corp. Additionally, Mr. Kaul has served as President, Chief Executive Officer and Director of KV Acquisition II, KV Acquisition III and KV Acquisition IV since their inceptions in January 2021. Mr. Kaul holds a B.S. degree in Biology from the University of Michigan, an M.S. degree in Biochemistry from the University of Maryland and an M.B.A. from Harvard Business School. We believe that Mr. Kaul is qualified to serve as a member of our Board due to his wide-ranging experience in technology companies and insight in the management of startup companies and the building of companies from early stage to commercial scale.

**Defendant Buckland**

55.     Defendant Buckland served as the COO, CFO, Treasurer, and Secretary of KV Acquisition Company II from January 2021 until the Merger. He also has been a Partner, Managing Director and COO at KV LLC since October 2019.

56.     The Merger Proxy Statement stated the following about Defendant Buckland:

Peter Buckland. Mr. Buckland has served as our Chief Operating Officer, Chief Financial Officer, Treasurer and Secretary since January 2021. Mr. Buckland has been a Partner, Managing Director and COO at Khosla Ventures since October 2019. Prior to joining Khosla Ventures, Mr. Buckland was a Partner at WilmerHale LLP, where he was Vice Chair of its Corporate Group and led the firm's emerging growth technology practice. Additionally, Mr. Buckland has served as the Chief Operating Officer, Chief Financial Officer, Treasurer and Secretary of KV Acquisition II, KV Acquisition III and KV Acquisition IV since their inceptions in January 2021. Mr. Buckland holds a

17

Verified Shareholder Derivative Complaint

B.A. from the University of California Santa Barbara and a J.D. from the University of San Francisco School of Law.

**Defendant Sands**

57. Defendant Sands served as a director of KV Acquisition Company II from January 2021 until the Merger.

58. The Merger Proxy Statement stated the following about Defendant Sands:

Anita Sands. Dr. Sands has served on the Board of Directors of ServiceNow, Inc. (NYSE: NOW) since July 2014. From April 2012 to September 2013, Dr. Sands served as Group Managing Director, Head of Change Leadership and a member of the Wealth Management Americas Executive Committee of UBS Financial Services, a global financial services firm. Prior to that, from April 2010 to April 2012, Dr. Sands was Group Managing Director and Chief Operating Officer of UBS Wealth Management Americas at UBS Financial Services, and from October 2009 to April 2010, Ms. Sands was a Transformation Consultant at UBS Wealth Management Americas. Prior to joining UBS Financial Services, Dr. Sands was Managing Director, Head of Transformation Management at Citigroup N.A.'s Global Operations and Technology organization. Dr. Sands also held several leadership positions with RBC Financial Group and CIBC. Dr. Sands has served on the board of directors of Symantec Corporation, a provider of security solutions, and currently serves on the board of directors of Pure Storage, Inc., a provider of enterprise flash storage solutions and iStar, a New York-based real estate development company. Dr. Sands holds a B.S. degree in Physics and Applied Mathematics from The Queen's University of Belfast, Northern Ireland, a Ph.D. degree in Atomic and Molecular Physics from The Queen's University of Belfast, Northern Ireland and an M.S. degree in Public Policy and Management from Carnegie Mellon University.

**Defendant Gaglioti**

59. Defendant Gaglioti served as a director of KV Acquisition Company II from January 2021 until the Merger.

60. The Merger Proxy Statement stated the following about Defendant Gaglioti:

Enrico Gaglioti. Mr. Gaglioti has served as Co-President of FS Investments since 2020, an investment management firm where he shares oversight of the

Verified Shareholder Derivative Complaint

firm's strategy. Prior to joining FS Investments, Mr. Gaglioti was the Co-Founder and CEO of Chiron Investment Management and a Partner at Goldman Sachs serving as the Global Head of Equity Sales. Mr. Gaglioti holds a BBA from James Madison University's College of Business. Dmitri Shklovsky. Mr. Shklovsky is the founder and managing partner of Bullingham Capital, a New York based private investment firm. Prior to 2019, Mr. Shkolvsky was a co-founder and managing partner of Atreaus Capital, a multi-billion dollar global macro and commodities hedge fund with offices in New York and London. Before co-founding Atreaus Capital in 2011, he served as a proprietary trader at both J.P. Morgan and Barclays. Mr. Shklovsky was also with Tudor Investment Corporation, a leading multi-strategy hedge fund, and he began his career in 1998 at Long Term Capital Management, a Greenwich CT based hedge fund. Mr. Shklovsky is a trustee and a board member of the U.S. Olympic and Paralympic Foundation and serves on the Cornell University Engineering College Council. Mr. Gaglioti holds a B.S. in Computer Science and M.Eng. in Operations Research and Financial Engineering from Cornell University.

## Defendant Shklovsky

61. Defendant Shklovsky served as a director of KV Acquisition Company II from January 2021 until the Merger.

62. The Merger Proxy Statement stated the following about Defendant Shklovsky:

Dmitri Shklovsky. Mr. Shklovsky is the founder and managing partner of Bullingham Capital, a New York based private investment firm. Prior to 2019, Mr. Shkolvsky was a co-founder and managing partner of Atreaus Capital, a multi-billion dollar global macro and commodities hedge fund with offices in New York and London. Before co-founding Atreaus Capital in 2011, he served as a proprietary trader at both J.P. Morgan and Barclays. Mr. Shklovsky was also with Tudor Investment Corporation, a leading multi-strategy hedge fund, and he began his career in 1998 at Long Term Capital Management, a Greenwich CT based hedge fund. Mr. Shklovsky is a trustee and a board member of the U.S. Olympic and Paralympic Foundation and serves on the Cornell University Engineering College Council. Mr. Gaglioti holds a B.S. in Computer Science and M.Eng. in Operations Research and Financial Engineering from Cornell University.

## Defendant Gurley

Verified Shareholder Derivative Complaint

63.    Defendant Gurley has served as a Company director since the Merger. He is the founding investor of Legacy Nextdoor. He also serves as a member of the Nominating, Corporate Governance and Corporate Responsibility Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Gurley beneficially owned 98,799 shares of Company Class A common stock and 52,649,930 shares of Company Class B common stock. Through his holdings, he held 23.91% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Gurley beneficially owned approximately $222,298 worth of Nextdoor Class A common stock as of that date.

64.    For the 2022 Fiscal Year, Defendant Gurley received $ 69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

65.    The 2024 Proxy Statement stated the following about Defendant Gurley:

> Mr. Gurley serves as a general partner of Benchmark Capital, a venture capital firm, which he joined in 1999. Previously, he served as a partner of Hummer Winblad Venture Partners, a venture capital firm, a research analyst for Credit Suisse First Boston, an investment bank, and a design engineer at Compaq Computer Corporation, a manufacturer of computers and related components. Mr. Gurley currently serves on the board of directors of Stitch Fix, Inc. and Zillow Group, Inc. Mr. Gurley previously served on the board of directors of GrubHub, Inc., OpenTable, Inc., and Ubiquiti Networks, Inc. Mr. Gurley holds a B.S. in Computer Science from the University of Florida and an M.B.A. from the University of Texas.

**Defendant Meeker**

66.    Defendant Meeker served as a Company director from the Merger until June 18, 2024. She also served as a member of the Compensation and People Development Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Meeker beneficially owned 1,497,170 shares of Company Class A common stock and 6,957,234 shares of Company Class B common stock. Through her

20

Verified Shareholder Derivative Complaint

holdings, she held 3.23% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Meeker beneficially owned approximately $15.6 million worth of Nextdoor Class A common stock as of that date.

67. For the 2022 Fiscal Year, Defendant Meeker received $ 69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

68. The 2023 Proxy Statement stated the following about Defendant Meeker:

Ms. Meeker has been a general partner at BOND, a global technology investment firm, since January 2019. Prior to co-founding BOND, she was a partner at Kleiner Perkins Caufield & Byers, a venture capital firm, from December 2010 to December 2018. From 1991 to 2010, Ms. Meeker worked as a managing director at Morgan Stanley, an investment bank. Ms. Meeker serves on the board of directors of Block, Inc. She previously served on the boards of directors of Lending Club Corporation and DocuSign, Inc. Ms. Meeker earned a B.A. in psychology from DePauw University and an M.B.A. from the Johnson Graduate School of Management at Cornell University.

**Defendant Pressman**

69. Defendant Pressman has served as a Company director since the Merger. He also serves as the Chairperson of the Compensation and People Development Committee and as a member of the Audit and Risk Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Pressman beneficially owned 249,887 shares of Company Class A common stock and 27,360,232 shares of Company Class B common stock. Through his holdings, he held 12.44% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Pressman beneficially owned approximately $562, 245 worth of Nextdoor Class A common stock as of that date.

21

Verified Shareholder Derivative Complaint

70.     For the 2022 Fiscal Year, Defendant Pressman received $69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

71.     The 2023 Proxy Statement stated the following about Defendant Pressman:

Mr. Pressman has been a managing director at Shasta Ventures, a venture capital firm, since 2005. Previously, Mr. Pressman was Vice President of Strategy and Operations at Walmart.com, an e-commerce company and subsidiary of Walmart Inc., from 2000 to 2004. Mr. Pressman currently serves on the board of directors for Zuora, Inc. He also serves on the boards of directors of a number of private companies, particularly in the software-as-a-service ("SAAS") and online service industries. He holds a B.S. in Finance from the University of Maryland, College Park and a M.B.A. from Stanford University Graduate School of Business.

**Defendant Sze**

72.     Defendant Sze has served as a Company director since the Merger. He also serves as the Chair of the Audit and Risk Committee and as a member of the Compensation and People Development Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Sze beneficially owned 12,229,371 shares of Company Class A common stock and 21,196,977 shares of Company Class B common stock. Through his holdings, he held 10.18% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Sze beneficially owned approximately $27.4 million worth of Nextdoor Class A common stock as of that date.

73.     For the 2022 Fiscal Year, Defendant Sze received $69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

74.     The 2023 Proxy Statement stated the following about Defendant Sze:

Mr. Sze has served as a general partner at Greylock Partners, a venture capital firm, which he joined in 2000, where he primarily oversees investments in entrepreneurial and consumer technology companies. Previously, he was the

22

Verified Shareholder Derivative Complaint

Senior Vice President of Product Strategy at Excite and Excite@Home, a web portal for content. He previously served on the boards of directors of LinkedIn and Pandora Media, Inc. Additionally, he is a member of the Board of Trustees at Yale University and Rockefeller University. Mr. Sze also serves on the boards of directors for several private companies in the consumer technology sector. He holds a B.A. in Economics and Political Science from Yale University and an M.B.A. from Stanford University Graduate School of Business.

**Defendant Varelas**

75.     Defendant Varelas has served as a Company director since the Merger. He also serves as the Chair of the Nominating, Corporate Governance and Corporate Responsibility Committee and as a member of the Audit and Risk Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Varelas beneficially owned 98,799 shares of Company Class A common stock. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Varelas beneficially owned approximately $222,298 worth of Nextdoor Class A common stock as of that date.

76.     For the 2022 Fiscal Year, Defendant Varelas received $69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

77.     The 2024 Proxy Statement stated the following about Defendant Varelas:

Mr. Varelas has served as co-founder of Riverwood Capital, a private equity firm, since January 2008. Prior to founding Riverwood Capital, he was a managing director at Citigroup Global Markets, Inc., an investment bank, where he also served as Global Head of Technology, Media & Telecom Investment Banking. Mr. Varelas serves on the boards of directors of a number of private companies and institutions. He also serves on the advisory boards for Streamlined Ventures and the RAND Corporation's Center for Global Risk and Security. Mr. Varelas earned a B.A. in Economics and Philosophy from Occidental College and an M.B.A. from the Wharton School at the University of Pennsylvania.

**Defendant Tolia**

23

Verified Shareholder Derivative Complaint

78.     Defendant Tolia is a co-founder of Legacy Nextdoor. Defendant Tolia has served as a Company director since the Merger. Since May 8, 2024, Defendant Tolia has served as CEO, President, and Chairperson of the Board. Previously, Defendant Tolia served as Executive Chairperson of the Board from March 18, 2024 until May 8, 2024. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Tolia beneficially owned 98,799 shares of Company Class A common stock and 33,074,393 shares of Company Class B common stock. Through his holdings, he held 14.68% of the combined voting power of the Company as of March 31, 2024. Given that the price per share of the Company's Class A common stock was $2.25 when markets closed on March 28, 2024, Defendant Tolia beneficially owned approximately $222,298 worth of Nextdoor Class A common stock as of that date.

79.     For the 2022 Fiscal Year, Defendant Tolia received $69,505 in total compensation from the Company, including $17,500 in fees earned or paid in cash and $52,005 in option awards.

80.     The 2024 Proxy Statement stated the following about Defendant Tolia:

Mr. Tolia has served as the Executive Chair since March 2024, and will serve as the Chief Executive Officer, President and Chairperson of the Board of Directors, effective as of the Transition Date. Mr. Tolia is a co-founder of Nextdoor, Inc. and previously served as its Chief Executive Officer from September 2010 to December 2018. Before his tenure at Nextdoor, Inc., Mr. Tolia was an Entrepreneur in Residence at Benchmark Capital, a venture capital firm, Chief Operating Officer of Shopping.com, an online shopping website, and Chief Executive Officer and co-founder of Epinions.com Corporation, a consumer review website company. Mr. Tolia currently serves as Non-Executive Chair, and previously served as Executive Chair, of Hedosophia, a leading technology investor, and is a co-founding director of the William S. Spears Institute for Entrepreneurial Leadership in SMU's Cox School of Business. He earned a B.A. in English from Stanford University.

**Defendant Bryant**

81.     Defendant Bryant served as a Company director from the Merger until he resigned from the Board on March 29, 2024. He also served on the Nominating,

24

Verified Shareholder Derivative Complaint

Corporate Governance and Corporate Responsibility Committee. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Varelas beneficially owned 229,820 shares of Company Class B common stock.

82. For the 2022 Fiscal Year, Defendant Bryant received $17,500 in total compensation from the Company, consisting entirely of $17,500 in fees earned or paid in cash.

83. The 2023 Proxy Statement stated the following about Defendant Bryant:

> Mr. Bryant has served as the Founder, Chairman, and Chief Executive Officer of Operation HOPE Inc, a nonprofit financial services network for the underserved, since May 1992. Mr. Bryant has also served as the Chairman and Chief Executive Officer of Bryant Group Ventures, Inc., a private holding group, since 1991, and the Founder and Principal of the Promise Homes Company, a single-family residential rental property management company, since June 2017. He previously served on the board of directors for Ares Commercial Real Estate Corporation. Mr. Bryant was a participant at the Global Public Policy & Leadership Program at the Harvard University John F. Kennedy School of Government and attended Hollywood Professional School.

**Defendant Wishom**

84. Defendant Wishom served as a Company director from the Merger until she resigned from the Board on August 1, 2024. She also served as a member of the Compensation and People Development Committee. According to the 2023 Proxy Statement, as of March 31, 2023, Defendant Wishom beneficially owned 229,820 shares of Company Class B common stock.

85. For the 2022 Fiscal Year, Defendant Wishom received $17,500 in total compensation from the Company, consisting entirely of $17,500 in fees earned or paid in cash.

86. The 2023 Proxy Statement stated the following about Defendant Wishom:

> Ms. Wishom serves as the President of Skywalker Holdings, LLC, a private holding company, and before that as Chief Operations Officer since 2015. Before joining Skywalker, Ms. Wishom spent over 20 years at Harpo Productions, an American multimedia production company. At Harpo

25

Verified Shareholder Derivative Complaint

Productions she held various production, programming, development and executive roles for The Oprah Winfrey Show, Harpo Studios and OWN: The Oprah Winfrey Network and most recently as the Executive Vice President. Ms. Wishom currently serves on the board of directors of Pinterest, Inc. She earned a B.A. in English from the University of California, Berkeley.

**The Sponsor**

87.    The Sponsor, Khosla Ventures SPAC Sponsor II LLC, a Delaware limited liability company, served as the sponsor of KV Acquisition Company II leading up to the Merger and is affiliated with several of the Individual Defendants. The Sponsor and its affiliates were conflicted in the Merger given their investments in KV Acquisition Company II, which would be rendered worthless without a business combination.

88.    Defendants Khosla, Kaul, and Buckland were the three managing members of the Sponsor at all relevant times.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

89.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

90.    Each director and/or officer of the Company owes to Nextdoor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

91.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided

Verified Shareholder Derivative Complaint

and abetted the same.

92. To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

93. Each Individual Defendant at KV Acquisition Company II leading up to the Merger, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of those Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by certain of the Individual Defendants who collectively comprised the Company's Board at all relevant times.

94. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at KV Acquisition Company II had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the

Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

95.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Nextdoor's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's

Verified Shareholder Derivative Complaint

shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

96.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

97.    At all times relevant hereto, the Individual Defendants at KV Acquisition Company II were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

98.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

99.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

100.    In committing the wrongful acts alleged herein, the Individual Defendants

Verified Shareholder Derivative Complaint

have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

101.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

102.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of KV Acquisition Company II's board of directors and Legacy Nextdoor's board of directors, each of the Individual Defendants who was a director of KV Acquisition Company II or Legacy Nextdoor was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

103.   Each of the Individual Defendants and the Sponsor aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and the Sponsor acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware

Verified Shareholder Derivative Complaint

of his overall contribution to and furtherance of the wrongdoing.

104.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company or Legacy Nextdoor and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND AUDIT & RISK COMMITTEE CHARTER

### Nextdoor's Code of Conduct

105.   Under the "Purpose" section heading of the Code of Conduct, the Code of Conduct states that the Company "supports and upholds a set of core values and principles, and the success of our business depends on each of us understanding these values and principles and continuously demonstrating the uncompromising integrity that is the foundation of our company." The Code of Conduct also states that "all our employees, directors and officers are required to read and comply with our Code" and that the Code of Conduct applies to "our employees, contractors, consultants, agents, representatives, officers and members of our Board."

106.   Under the same section heading, the Code of Conduct provides that:

> Each of us has a responsibility to act with integrity – both in terms of how we treat each other, and in terms of how we run our business. This Code of Business Conduct and Ethics ("Code") summarizes the legal and ethical standards for all employees, contractors, consultants, agents, representatives, officers and members of our Board of Directors (the "Board"), and is intended to serve as a guide to help you make legal and ethical decisions when conducting the Company's business and performing your day-to-day duties. However, the Company understands that this Code will not address or anticipate every situation you might face, or concern you may have about conducting the Company's business legally and ethically. If you have a question about any course of conduct or this Code, the Company encourages you to consult your supervisor or our Head of Legal before proceeding.

107.   Under the section heading titled "DOING OUR JOBS WITH INTEGRITY," the Code of Conduct provides that Nextdoor "expects each of you to strive for excellence and work with integrity in all you do. It is unacceptable to cut

ethical or legal corners for any reason."

108. Under the section heading titled "HONEST AND ETHICAL CONDUCT," the Code of Conduct provides the following:

> You must act within guidelines that prohibit real and potential conflicts of interest with your role at the Company. Generally, conflicts of interest are situations that divide your loyalty between the Company, on the one hand, and your own personal interests, on the other. Determining whether a conflict of interest exists is not always easy to do. Even the appearance of a conflict of interest could create a problem.

109. Under the same section heading, the Code of Conduct provides:

> You must always get approval from our Head of Legal before participating in any transaction that could result in a potential conflict of interest. Conflicts of interest are fact-specific. For example, you may accept an approved gift from a vendor, but if you then decide to do business with that vendor without evaluating others, there could be a potential conflict of interest. When in doubt about any potential conflict of interest, contact our Head of Legal.

110. Under the section heading "COMPLYING WITH THE LAW," the Code of Conduct provides:

> Everyone at the Company is expected to comply with the law. Laws can be complex and at times, even counterintuitive. Although it's impossible to know all aspects of every law, you should understand the major laws, rules and regulations that apply to your work. You should consult with our Head of Legal if you are unsure or have any questions or concerns related to your work. A few specific areas of legal compliance are discussed in greater detail below.

111. Under the section heading "Fair Sales and Marketing Practices," the Code of Conduct provides:

> We compete vigorously for business based solely on the merits of our products and services. We do not participate in any activities that unfairly harm competition. We want to win, but win fairly.
>
> We will accurately represent the Company and our products and services in our marketing, advertising and sales materials. We can promote our products and services and make comparisons between us and our competitors.

Verified Shareholder Derivative Complaint

Deliberately misleading messages, leaving out important facts or false claims about our products and services or competitors are inconsistent with our policies.

112.   Under the section heading "FINANCIAL MATTERS AND BUSINESS PRACTICES," the Code of Conduct provides:

You are expected to act responsibly and exercise sound judgment with respect to our finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. You may execute financial transactions only with authorization and in compliance with our policies.
You also are expected to record and report all financial transactions and business information honestly and accurately, to comply with our system of internal controls and to follow applicable laws, regulations and accounting practices.

We regularly file reports and other documents with regulatory authorities, including the U.S. Securities and Exchange Commission ("SEC"). In addition, we may make other public communications, such as press releases, from time to time.

Depending upon your position with the Company, you may be called upon to provide information to help ensure that our public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to our public disclosures. Employees involved in preparing public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures.

If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of our Head of Legal. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should follow the procedures set forth in our Whistleblower Policy.

33

Verified Shareholder Derivative Complaint

113.   Under the section heading, "SEC Reporting and Financial Statement Preparation," the Code of Conduct provides:

Our periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws, and SEC rules. If you contribute in any way to the preparation or verification of our financial statements and other financial information, you must ensure that our books, records and accounts are accurately maintained. You must also cooperate fully with our finance department, as well as our independent public accountants and counsel. If you are involved in the preparation of our SEC reports or financial statements, you must:

● Be familiar with and comply with our disclosure controls and procedures and our internal control over financial reporting.

● Take all necessary steps to ensure that all filings with the SEC and all other public communications about our financial and business condition provide full, fair, accurate, timely and understandable disclosure.

114.   Under the section heading, "Quarterly Compliance Certifications," the Code of Conduct provides:

Depending on your position here at the Company, we may ask you to certify your knowledge of various facts each quarter. We rely on certifications to record transactions, make legal and accounting determinations and comply with laws. If you do not provide a certification or complete a certification completely, honestly and accurately, you may be in violation of this Code. This will result in disciplinary action up to and including termination of your service with the Company.

115.   Under the section heading, "Penalties for Violations of Company Policies," the Code of Conduct provides:

You are expected to be familiar with and comply with all Company policies. If you have a question regarding any course of conduct, consult your supervisor or the Head of Legal before moving forward. Those who violate our policies are subject to disciplinary action up to and including termination of employment. Examples of misconduct that may result in disciplinary measures includes:

● Violating any Company policy;

34

Verified Shareholder Derivative Complaint

● Failing to report known or suspected violations of any Company policy;

● Failure to cooperate in a Company investigation into possible violations of Company policies; and

● Engaging in retaliation.

***Nextdoor's Audit & Risk Committee Charter***

116.    Nextdoor's Audit & Risk Committee Charter provides, under the heading titled "Purpose," that the purpose of Nextdoor's Audit & Risk Committee "is to assist the Board in fulfilling its oversight responsibilities relating to" the following:

● the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;

● the qualifications, independence and performance of the Company's independent auditors (the "Independent Auditors");

● the design, implementation and performance of the Company's internal audit function;

● risk assessment and management; and

● compliance by the Company with legal and regulatory requirements.

117.    Under the heading titled "Responsibilities," Nextdoor's Audit & Risk Committee Charter provides, in relevant part:

1. Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results.

2. Review and discuss the following with management, the internal auditors (if any), and the Independent Auditors, as applicable:

● the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements should be included in the

Company's Annual Report on Form 10-K;

● the results of the Independent Auditors' audit or review of the financial statements;

● all critical audit matters (CAMs) proposed by the Independent Auditor to be included in the Independent Auditor's annual audit report;

● any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"); and

● any significant issues, events and transactions as well as any significant changes regarding accounting principles, practices, policies, judgments or estimates.

118.    Under the heading titled "Internal Controls," Nextdoor's Audit & Risk Committee Charter provides, in relevant part:

With respect to the Company's internal controls, the Committee will:

1. Review and discuss with the Company's management, its internal auditors (if any), and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

2. Review any allegations of fraud that are disclosed to the Committee involving management or any employee of the Company with a significant role in the Company's accounting and financial reporting process and systems of internal controls.

3. Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

4. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

5. Establish procedures for (a) the receipt, retention and treatment of

36

Verified Shareholder Derivative Complaint

complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

119. Under the heading titled "Risk Oversight and Compliance," Nextdoor's Audit & Risk Committee Charter provides, in relevant part:

The Committee will:

1. Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

2. Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.

3. Review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time.

4. Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

5. Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

120. In violation of the Code of Conduct and the Audit & Risk Committee Charter, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but

37

Verified Shareholder Derivative Complaint

not limited to breaches of fiduciary duty by engaging in or effectuating the Overpayment Misconduct and violations of Sections 10(b) and 20(a) of the Exchange Act. Also in violation of the Company's Code of Conduct and the Audit & Risk Committee Charter, the Individual Defendants failed to maintain the accuracy of Nextdoor reports and other documents filed with the SEC, comply with laws and regulations, conduct business in an honest and ethical manner, ensure the efficient and responsible use of Nextdoor's assets and resources by Nextdoor, and oversee the integrity of financial information provided by Nextdoor to its shareholders, the public, and any stock exchange.

121.    The Individual Defendants who were at the Company before the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty and violations of Sections 10(b) and 20(a) of the Exchange Act. Also in violation of the Company's Code of Conduct and the Audit & Risk Committee Charter, the Individual Defendants who were at the Company before the Merger failed to maintain the accuracy of Company records and reports, comply with laws and regulations, oversee the integrity of the Company's financial statements, and maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Background of KV Acquisition Company II*

122.    KV Acquisition Company II was incorporated in Delaware on January 29, 2021, as a blank check company formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. KV Acquisition Company II was sponsored by Defendant Sponsor, which Defendants Khosla, Buckland, and Kaul controlled as the Sponsor's three managing members.

Verified Shareholder Derivative Complaint

123. Throughout the Relevant Period, the Individual Defendants associated with KV Acquisition Company II represented themselves to the investing public as having substantial experience in identifying targets and acquiring businesses.

124. Leading up to the Merger, KV Acquisition Company II represented to investors that it was specifically seeking a private company with a "large market opportunity" that boasted a "highly differentiated" proprietary technology to take public.

### Background of Nextdoor's Business Model

125. Self-titled as the "neighborhood network," Legacy Nextdoor ran an online social networking platform intended for use by neighbors, public agencies, and businesses. To do this, Legacy Nextdoor's platform had multiple features such as a news feed where users could look at posts, discussions, and pictures from fellow users, in addition to notifications, comments, and groups. In general, the platform allowed users to communicate information, services, and products.

126. Legacy Nextdoor's platform began in the U.S. in 2011. Since then, it has grown to ten other countries including the United Kingdom, Canada, Australia, Netherlands, France, Spain, Italy, Germany, Sweden, and Denmark. However, most of the Company's revenue still comes from the U.S. market.

127. Almost all Nextdoor's revenues stem from advertising sales. Nextdoor purports to offer unique advertising capabilities that permit advertisers to target local users at scale. Advertisers on the platform include big national brands to small and mid-sized companies.

128. The value of the Company's advertising space is directly dependent on the volume of users and user engagement with the platform. For this reason, this information was highly material to investors. The Company's business model relies upon vital metrics such as ARPU (average revenue per weekly active user), which is defined as total revenue in a certain geographic area during a period divided by the

average of the number of WAUs (Weekly Active Users) in the specified geographic area during the same period—which Legacy Nextdoor claimed would continue to facilitate "hyper growth" for "multiple years." Unbeknownst to the investing public, however, Legacy Nextdoor benefitted tremendously from the unique macroeconomic implications of COVID-19 lockdowns and related societal behavior, and as a result, Legacy Nextdoor's rapid growth would not be sustainable and was, in fact, reversing by July 2021.

### The Individual Defendants Wanted the Merger to Close to Profit Off Their Investments

129. In January 2021, the Sponsor purchased an aggregate of 10,000,000 Founder Shares for an aggregate purchase price of $25,000 in cash, or approximately $0.0025 per share. The Founder Shares were designed to represent approximately 15-30% of KV Acquisition Company II's outstanding shares upon completion of KV Acquisition Company II's IPO. As the Founder Shares did not entitle the Individual Defendants to redemption rights, the Founder Shares would have expired worthless if KV Acquisition Company II failed to timely complete a business combination.

130. On March 26, 2021, simultaneously with the closing of KV Acquisition Company II's IPO, Defendant Sponsor purchased an aggregate of 1,100,000 Private Placement shares for a purchase price of $11,000,000, or $10.00 per share. Similar to the Founder Shares, as the Private Placement shares did not entitle the Individual Defendants to redemption rights, the Private Placement shares would have expired worthless if failed KV Acquisition Company II to timely complete a business combination.

131. The Sponsor's holdings of Founder Shares and Private Placement shares had significant value. For example, as reported by KV Acquisition Company II, Defendant Sponsor owned KV Acquisition Company II stock with an aggregate market value of approximately $103 million as of September 29, 2021.

132. As each of the Individual Defendants at KV Acquisition Company II at the

40

Verified Shareholder Derivative Complaint

time had either a direct or indirect economic interest in the Sponsor's holdings of Founder Shares and Private Placement shares, they stood to profit immensely from the Merger. Yet, the Individual Defendants at KV Acquisition Company II were not the only ones with direct and indirect economic interests in completing the Merger. The Individual Defendants at Legacy Nextdoor stood to benefit tremendously from the Merger as well. For instance, Defendant Friar, according to the Merger Proxy Statement, stood to receive more than 15.7 million Nextdoor Class B shares pursuant to the Merger closing, while Defendant Doyle stood to receive more than 1.7 million Nextdoor Class B shares pursuant to the Merger closing. Indeed, months before the Merger—in March 2021—Defendant Friar was granted stock options to buy 1.7 million shares—740,000 of which were primed to vest immediately upon the Merger closing in November 2021. At that same time, Defendant Doyle was granted stock options to buy more than 180,000 shares that were scheduled to vest during the 2022 and 2023 Fiscal Years. Additionally, other Individual Defendants—including Defendants Bryant, Kilgore, Gurley, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom—stood to directly benefit from the Merger by receiving directorship positions on the board of a publicly traded company on the NYSE, in addition to receiving significant equity awards in the form of stock awards and stock options pursuant to the Merger and to the 2021 Plan, and to receiving the immediate conversion of their Legacy Nextdoor stock holdings into stock holdings of a publicly traded company on the NYSE.

133. The Individual Defendants' profits were not guaranteed, however, as the Individual Defendants' ability to profit off their investments was subject to certain restrictions in KV Acquisition Company II's Certificate of Incorporation and/or for those at Legacy Nextdoor or the post-Merger Company, profits were contingent on the Overpayment Misconduct and concurrent Merger.

134. According to KV Acquisition Company II's Certificate of Incorporation, KV Acquisition Company II only had 24 months from the date of the IPO's closing to

41

Verified Shareholder Derivative Complaint

complete a business combination, the failure of which would have resulted in KV Acquisition Company II: (1) ceasing all of its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeeming public shares; and (3) dissolving and liquidating the funds held in the Trust to return to KV Acquisition Company II's investors. Because each of KV Acquisition Company II's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the Founder Shares and Private Placement shares would have expired worthless in the event KV Acquisition Company II failed to timely complete a business combination.

135. Accordingly, the Individual Defendants moved as quickly as possible to facilitate merger discussions between KV Acquisition Company II and Legacy Nextdoor so that they complete a business combination and cash out on their investments.

### *Background of Legacy Nextdoor*

136. Legacy Nextdoor was co-founded in 2007 by Defendant Tolia, Sarah Leary and Prakash Janakiraman along with founding investor Defendant Gurley. Legacy Nextdoor sought to "cultivate a kinder world where everyone has a neighborhood they can rely on" through a mission to be "the neighborhood hub for trusted connections and the exchange of helpful information, goods, and services."

137. Like other social media and technology companies, Legacy Nextdoor's business model utilized the unique local data sets gathered from the platform's users, including demographic data, interests, and user behaviors by supplying real-time local data to businesses so that businesses can devise advertising strategies and engage in targeted advertising. To this end, Legacy Nextdoor's platform features a library of ad formats, including sponsored posts and lead generation, which feature combinations of text (static or dynamic), images (including static and animated), and URL links, allowing advertisers to purchase and deliver ads across the platform.

*Commencement of Merger Discussions*

138. By April 21, 2021, Legacy Nextdoor and KV Acquisition Company II commenced discussions regarding the Merger and had executed a confidentiality agreement (the "Confidentiality Agreement"). KV Acquisition Company II also retained Morgan Stanley & Co. LLC to assist with KV Acquisition Company II's due diligence of Legacy Nextdoor.

139. As stated in the Merger Proxy Statement, during the period between July 6, 2021 and November 5, 2021, KV Acquisition Company II and its advisors repeatedly touted to investors that they had conducted "extensive" due diligence of Legacy Nextdoor. This was, however, false, as KV Acquisition Company II's supposed due diligence of Legacy Nextdoor unreasonably failed to: (1) investigate and confirm Legacy Nextdoor's claims about having a total addressable market of 312 million households; (2) investigate the unique impact COVID-19 had on Legacy Nextdoor's growth trends, including how Legacy Nextdoor's future advertising growth would be hampered by the growth brought on by COVID-19; (3) investigate and confirm that Legacy Nextdoor's growth trends were already reversing by July 2021; (4) investigate and confirm that the U.S. market—Legacy Nextdoor's most important market—was already oversaturated; and (5) investigate and confirm Legacy Nextdoor's revenue trajectory and guidance. As set forth below, the process leading up to the Merger was also tainted with impropriety, including undisclosed and significant conflicts of interest.

**The Overpayment Misconduct**

*Failure of "Hyper" Growth*

140. Legacy Nextdoor insiders concealed from investors that they knew, since prior to the Relevant Period, that Legacy Nextdoor benefitted tremendously from the unique macroeconomic implications of COVID-19 lockdowns and related societal behavior, and as a result, Legacy Nextdoor's rapid growth would not be sustainable and was, in fact, reversing by July 2021.

43

Verified Shareholder Derivative Complaint

141. Starting in 2020, demand for Legacy Nextdoor's platform rose sharply as shelter-in-place mandates and other social distancing restrictions spurred individuals to pursue new types of social interactions and connections, as well as use new methods to receive information in their respective communities. Because of this unique macroeconomic and social environment, Legacy Nextdoor expanded quickly in 2020—WAUs rose almost 37% from 19.5 million in 2019 to almost 27 million in 2020. ARPU during that same time also rose 10% from $4.23 to $4.62.

142. In this rosy environment of extreme growth, the Individual Defendants decided to take Legacy Nextdoor public through the Merger. After they announced the Merger, the Individual Defendants boasted about Legacy Nextdoor's "phenomenal" growth, representing that the platform was in "1 in 3 U.S. households," and stating that Legacy Nextdoor had seen "27M+ Weekly Active Neighbors" and "60M+ Verified Neighbors." The Individual Defendants also represented that Legacy Nextdoor's impressive growth was positioned to continue, asserting that the Company had a "huge runway" ahead of it, and that Nextdoor could enlarge its user base "4.5x" in just the already existing market. For instance, during a July 2021 conference call, Defendant Friar stated that Legacy Nextdoor's total addressable market was "large and still untapped," stated that Legacy Nextdoor could grow in the "near term" adding "150 million households globally, just doing what we do today." During the same call, Defendant Doyle further stated that Legacy Nextdoor was "really early to monetization" and expressed "great confidence" the Company's revenue growth "c[ould] be sustained into the future."

143. The Individual Defendants continued to make numerous similar representations about the Company's growth capabilities and overall business prospects throughout the Relevant Period.

144. However, these statements were materially false and misleading, as the Company's extreme growth during the pandemic was a unique side effect of the

pandemic, not a symptom of a robust and healthy business model. Indeed, the market for Nextdoor's platform was materially smaller than represented and Nextdoor's most important market (the United States) was already saturated by the beginning of the Relevant Period, which negatively impacted Nextdoor's capability to monetize users, grow its U.S. WAUs, or increase ARPU. Consequently, the Individual Defendants' statements about the Company's 2022 Fiscal Year revenue were not based in fact, and as a result, Nextdoor would perform well below the represented revenue and growth trajectory by many millions of dollars.

145.   Toward the end of the Relevant Period, the Individual Defendants, eventually began to reveal the truth through the release of the Company's quarterly financial results—which directly contradicted the Individual Defendants' statements.

### *Conflicts of Interest and Inadequate Due Diligence*

146.   Tellingly, the Individual Defendants at KV Acquisition Company II failed to obtain any independent valuation or advice informed by independent counsel. Rather, the Individual Defendants relentlessly pushed investors to approve a deal that was worth little to nothing, and far less than what investors would have received had the KV Acquisition Company II liquidated as planned.

147.   Even as revenue growth slowed down for Legacy Nextdoor leading up to the Merger, the Individual Defendants failed to appropriately reevaluate the Merger, choosing instead to place their own self interests ahead of the Company's and its shareholders.

148.   The Individual Defendants that effectively controlled the Sponsor made no effort to obtain or review any materials concerning Legacy Nextdoor's valuation throughout the period leading up to the Merger. Instead, they took a back seat, conducted inadequate due diligence, prompted shareholders to approve the Merger, and praised Defendant Friar's fundamental role at Legacy Nextdoor, despite glaring issues.

149.   In reality, far from being able to sustain "hyper growth," Legacy Nextdoor

45

Verified Shareholder Derivative Complaint

was uniquely benefitting from an anomaly in macroeconomic conditions caused by the COVID-19 pandemic that inhibited the Individual Defendants from knowing or representing anything concrete about the Company's commercial viability. This did not stop the Individual Defendants from concocting a false image of Legacy Nextdoor and its future prospects post-Merger which enabled funds locked in the Trust to be used in connection with funding the Merger and its associated costs.

150. Basic due diligence would have revealed these issues and would have required a Company fiduciary to steer away from the value-destroying asteroid KV Acquisition Company II was headed towards. The Individual Defendants did the opposite, proceeding full speed ahead without any indication that KV Acquisition Company II's fiduciaries made any reasonable or basic investigation.

151. There is no indication that the KV Acquisition Company II Board ever held any meetings to discuss the substantive pros and cons for KV Acquisition Company II shareholders of pursuing the Merger or received any written materials related to its diligence in connection therewith.

152. Proceeding with the Merger proved costly in numerous ways, including by exposing KV Acquisition Company II, the Sponsor, and certain of the other Individual Defendants to liability in the Securities Class Action, among other things. By July 2024, the Company's shareholders had lost over 70% of the $10 per share they put into the Trust without considering the value destruction caused by Nextdoor's lack of viable growth. Given their conflicts of interest, the Company's Board failed to adequately inform shareholders about their prospects post-Merger, including that redeeming their shares would be a better idea.

153. On top of this, the Individual Defendants further breached their fiduciary duties by causing Nextdoor to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2022 and September 2022, approximately 23,251,703 shares of Nextdoor's common stock were

46

repurchased, costing the Company over ***$77.2 million***. As the Company's stock was actually only worth $2.06 per share, the price at which it was trading when markets closed on November 9, 2022, the Company overpaid for repurchases of its own stock by ***$40 million*** in total.

## False and Misleading Statements

### July 6, 2021 Press Release

154.    On July 6, 2021, KV Acquisition Company II and Legacy Nextdoor issued a joint press release in connection with the proposed merger between KV Acquisition Company II and Legacy Nextdoor. The press release stated that the Merger would "accelerate[] Nextdoor's growth plans" and produce a company valued at approximately $4.3 billion. The press release also featured a statement from Defendant Friar, which emphasized Legacy Nextdoor's "growth potential" and "strong network effects," stating the following, in relevant part: "***Our business strengthens as we scale, benefitting from strong network effects, and we believe the proposed transaction with KVSB accelerates the growth potential of our platform***."

### July 6, 2021 Investor Presentation

155.    On that same day, July 6, 2021, the Company filed a current report on Form 8-K with the SEC which included an investor presentation attached as an exhibit to the 8-K (the "July 2021 Investor Presentation"). The July 2021 Investor Presentation emphasized Legacy Nextdoor's allegedly large user base, and further represented that the Company was in "~1 in 3 U.S. Households," had "60M+ Verified Neighbors," "27M+ Weekly Active Neighbors," and was capable of "sustained revenue growth." The July 2021 Investor Presentation also stated that Legacy Nextdoor's total addressable market included 312 million households, and that the Company could grow its user base by "4.5x" in already existing markets. The July 2021 Investor Presentation further stated that Legacy Nextdoor's growth was "sustainable," stating that the Company had a "[s]trong foundation for continued revenue growth."

156. The July 2021 Investor Presentation also focused on Legacy Nextdoor's "significant monetization potential," asserting that the Company could grow considerably with its current ARPU and U.S. daily active users ("DAUs"), as stated in the presentation slide below:



*July 6, 2021 Conference Call*

157. Also on July 6, 2021, the Company held a conference call to discuss the upcoming Merger. Defendant Friar, during her prepared statement, emphasized Legacy Nextdoor's "large and still untapped" market. She also stated that the Company could expand in the "near term," adding "150 million households globally, just doing what we do today and continuing to expand."

158. Defendant Doyle, also during the conference call, emphasized Legacy Nextdoor's user base, asserting that the Company had accomplished "sustained" "tremendous growth" which was "deepening engagement" throughout the 2021 Fiscal Year, stating in relevant part:

48

Verified Shareholder Derivative Complaint

*We have a growing base of engaged and monetized users.* We have more than 60 million verified neighbors on the platform. To illustrate the composition of that member base, we have almost 15% of our members coming from markets outside the U.S. We're really excited at the level of organic growth that we're able to achieve. We had 68% of our members come to the platform organically in 2020. This is due to the strength of the brand, word-of-mouth and a great deal of earned media that we bring behind the purpose and the mission of Nextdoor.

*With this tremendous growth in verified members on the platform, we have the opportunity to really drive engagement.* And that's something that we saw demonstrated in 2020 and is *sustained in 2021 as well, where we had deepening engagement across all cohorts of users*. We were able to increase the frequency of sessions of active users on the platform and also the depth of sessions, the amount of content that users consume and also create, which set us up for driving monetization opportunities with our advertisers, creating a larger, unique audience that's more engaged, that's generating more supply that allows us to do creative things and achieve the campaign objectives of the advertisers and businesses on the platform.

159. Also, during the call, Defendant Friar stated that Legacy Nextdoor had "just . . . started" on its monetization efforts and further represented that the Company should beat Twitter's the monetization levels, stating in relevant part:

Nextdoor as a platform has just begun its monetization journey. In fact, when I joined about 2.5 years ago, we had just begun to tap into advertising. Today, if you look at our scale, we're about 1/3 the size of Twitter. And yet, if you look at our ARPU, we're at about 1/6 the ARPU. Of course, there is no structural reason why Nextdoor should undermonetize. In fact, if you think about either the video where you saw the wonderful California-based restaurant that was getting recommendations from us or if you think about what Vinod said about the value of a link on Nextdoor, I could perhaps (inaudible) *that Nextdoor should, in fact, over-monetize relative to those platforms.* So this tells me *we're just getting started*. And even with that top-of-the-funnel growth of new users, we should be able to drive healthy revenue growth as we scale our ARPU.

160. Likewise, during the call, Defendant Doyle emphasized Legacy Nextdoor's purported market opportunity size, asserting that the Company had a "huge runway" ahead and that the Company was "really early to monetization." Defendant Doyle stated he had "great confidence" the Company could grow revenue more than

40% through the 2022 Fiscal Year and that such revenue growth could be "sustained into the future," stating in relevant part:

> ***The tailwind of product-driven growth and increased engagement and the monetization opportunities that I've described give us great confidence in our ability to achieve revenue growth rates year-on-year of more than 40%, here shown through 2022, driving us to almost $250 million of revenue. And we believe these are levels that can be sustained into the future.***
>
> * * *
>
> We talked a lot about the focus on revenue. ***And for us, those drivers of ARPU that I just walked through give us great confidence in our ability to achieve greater than 40% year-on-year revenue growth in the next several years.*** We also want to talk about the investment we're making in the business. We're very much in investment mode, ***knowing there's a huge opportunity in front of us.*** An investment for us is really in product and growing the team. We have around 550 employees in the business. The majority of those focused on product development and engineering. And that is where our focus will remain and really driving the product forward and bringing more benefit to the entire ecosystem.

### *July 6, 2021 Financial Times Article*

161. Also, on July 6, 2021, the Company filed a Form 425 with the SEC that contained an article from *The Financial Times*. The article quoted Defendant Friar, who boasted that Legacy Nextdoor's growth potential was strong, stating: "'We think we're a company that can maintain hyper growth over multiple years.'"

### *July 6, 2021 CNBC Interview*

162. Also, on July 6, 2021, the Company filed a Form 425 with the SEC that contained a transcript from an interview on CNBC's "Squawk on the Street" with Defendants Friar and Khosla. During the interview, Defendant Friar stated that Legacy Nextdoor could "monetize and will grow a phenomenal revenue stream" after the Merger. Defendant Khosla elaborated, "the metrics and trends really run away . . . we loved the fact that there's so many different growth factors the company can take into the future." When correspondent David Faber asked if growth had "sort of peaked in 2020/'21 in terms of the revenue number maybe in part because of the pandemic" and

50

Verified Shareholder Derivative Complaint

whether this was a "concern for you as you try to sell the deal to your SPAC shareholders?" Defendant Khosla replied that "it isn't a concern for me[,] we see accelerating growth." Defendant Friar further added that Legacy Nextdoor was enjoying "phenomenal trends" and "accelerating ARPU," stating in relevant part:

> *[F]rom a business perspective, we're seeing terrific momentum*. We saw our DAU, daily active users, *grow 50% year-over-year last year*. [T]hat's always the starting point of any platform network business then you mentioned ARPU, *we're seeing phenomenal trends in q1 and q2 of 2021, we saw accelerating ARPU*. [I]t's really driven by, one, more engagement from the members on the platform; number two, our adtech platforms getting more sophisticated, and these proceeds will invest in data science and machine learning; and three, we're finding not supply driven ways to drive revenue, particularly around local commerce and businesses, and interesting ad formats that you can't get anywhere else.

### *July 9, 2021 Australia Start Up Daily Interview*

163.    On July 9, 2021, the Company filed a Form 425 with the SEC that contained a transcript from an interview of Defendant Friar on Australia Start Up Daily. During the interview, Defendant Friar was asked about Legacy Nextdoor's plans for growing the Company's already-existing user base. Defendant Friar responded by stating that The Company's user base was currently growing, due to Legacy Nextdoor's "natural network effect," stating in relevant part:

> So you're right in the US. We have gotten up to one in 3 households on the platform. Nextdoor is a platform that has a natural network effect so as more people come to the platform. The platform gets better and better for the people on the platform and so we just *know there's an underpinning growth rate happening in markets like the US, but then of course Australia, International, is an important next level of growth too*. We're in 11 countries in total around the world.

### *July 9, 2021 Cheddar News Interview*

164.    Also, on July 9, 2021, the Company filed a Form 425 with the SEC that contained a transcript from an interview of Defendant Friar with *Cheddar News*. During the interview, Defendant Friar was asked if Legacy Nextdoor could continually grow the user base. She replied that the Company had "quite a runway" in the U.S. and that

51

Verified Shareholder Derivative Complaint

it was "not an if" whether Legacy Nextdoor could grow the platform internationally but rather a "when," stating in relevant part:

> [Y]es so today we're in 11 countries. [W]hat we see in the u.s. is nextdoor is truly network business. [T]he more people that join the platform, the richer the content. more engaged members are and so growth bigats growth. [**S]o we know first of all there's just still quite a runway in the u.s. as i say everyone is a neighbor i would like that to be all households.** [O]utside the u.s. we're beginning to build in many countries. [UK] where in one in 6 households. [W]e know to bring that up to use only one in 3. [C]anada is our youngest country and our fastest growing it's been incredible to see canadian neighbors using the platform to particularly right now as they they look for vaccines. [A]nd of course we want to take this global next door should be a global platform. [W]e know we resonate around the world and **so it's really more of when not an if we take the whole platform to a global stage.**

***September 20, 2021 Investor Day***

165. On September 20, 2021, Legacy Nextdoor held an "investor day" to discuss the Company's business and financial prospects. During the presentation, Defendant Friar again emphasized Legacy Nextdoor's "growing" user base, asserting that "[t]oday, we're ubiquitous in the United States and growing globally." Defendant Friar went on to say that, "As of Q2, Nextdoor is in almost 1 in 3 U.S. households. Globally we have over 63 million verified neighbors on the platform that grew 17% year-over-year and over 29 million weekly active neighbors." Defendant Friar also cited the platform's "stickiness" and "strong network effects" as driving forces behind Legacy Nextdoor's "ongoing" growth, stating in relevant part:

> We've already created an incredible product market fit. When neighbors come to Nextdoor, 3 months in, 75% of them are still on the platform. 6 months in, that's 65%. And by 24 months in, that line begins to asymptote at well above 50%, and we're proud that our retention rate is estimated to be 20 points higher than leading peers. ***We know that, when people come, they come with intent and they stay. That stickiness is a really big piece of our ongoing growth.*** We also have strong network effects. In a young neighborhood with 5% to 10% of the households in that neighborhood on the platform, we see good engagement, but as we move up into our top quartile of neighborhood penetration, we start to see engagement levels that are over 2x what we see in the beginning. ***This is because more content on the platform drives more***

*engagement, which drives more people to join, which drives more content. That's our flywheel of growth.*

166.   Defendant Doyle also heralded Legacy Nextdoor's growth, stating that the Company's "extraordinary" user growth through the COVID-19 pandemic was "sustained . . . since that time," stating in relevant part:

> Between the second quarter of 2018 and the second quarter of 2021, *our most recently reported quarter, we grew weekly active users by 123%*. Our growth in WAU has been driven by our value proposition, a compelling combination of utility and community, and our product innovations and launches that have led to both increased engagement from our neighbors and top-of-the-funnel growth. Our extraordinary growth and engagement in the second quarter of 2020 was accelerated by the pandemic, when neighbors found real value in Nextdoor. *We are very pleased with our sustained growth in WAU since that time*, which now exceeds 29 million.

167.   Also, during the investor day presentation, Defendant Friar stated that Legacy Nextdoor had begun a "hyper growth and build phase" and that the Company had "many vectors for sustained revenue growth." Likewise, Defendant Doyle asserted that Legacy Nextdoor just began stages of monetization, stating that the Company was "just getting started" in regarding ARPU growth and that Legacy Nextdoor "should exceed the monetization level" of Twitter and Snap.

168.   Defendant Doyle also represented that Legacy Nextdoor's total addressable market was "large" and "under penetrated," stating in relevant part:

> Our total addressable market is both large and under penetrated. Everyone is a neighbor. We believe our near-term opportunity *is to grow to more than 200 million households and the long-term opportunity is to grow to over 300 million*. And this is just in our existing markets. We will continue to expand in new markets as well.

169.   Defendant Doyle further represented that, based upon Legacy Nextdoor's "outperformance" during the second quarter of the 2021 Fiscal Year, that Legacy Nextdoor would heighten its revenue guidance for the 2021 Fiscal Year. He further expressed "confidence" in delivering "sustained growth," even without Merger proceeds, maintaining that even higher growth could be had with the Merger's proceeds,

stating in relevant part:

> Our outperformance in Q2 has allowed us to increase our full year revenue estimate by $3 million, taking us to $181 million and increasing our 2021 expected growth rate to 47% year-on-year. ***The tailwind of product-driven growth, increasing engagement and new monetization opportunities gives us confidence in our ability to deliver sustained growth. We have also increased our revenue expectation in 2022 by $3 million to $252 million. Importantly, this plan does not assume the use of proceeds from this transaction, which we can deploy to further accelerate growth***.

***Merger Proxy Statement***

170.  On October 21, 2021, the Company filed the Merger Proxy Statement with the SEC, which served as a proxy statement, consent solicitation statement, and prospectus. The Individual Defendants solicited the Merger Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions and failed to correct prior misstatements.

171.  The Merger Proxy Statement solicited shareholders to approve, *inter alia*: (1) the Merger; (2) the 2021 Plan; and (3) the Employee Stock Purchase Plan. The Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the Merger Proxy Statement. Shareholders would not have approved the proposals in the Merger Proxy Statement, and thus, the Merger and the 2021 Plan, had they known the truth about Nextdoor. In total to date, the Company has awarded the following equity awards to the Individual Defendants pursuant to the 2021 Plan as a result of shareholders approving the 2021 Plan under false pretenses:

**AMOUNTS RECEIVED UNDER THE 2021 PLAN**

| Individual | Grant Date | Shares of Common Stock/ Stock Options/ RSUs Awarded | Grant Date Fair Value | Price Per Share/ Right to Purchase Price |
|---|---|---|---|---|
| *Sarah Friar,* | 03/25/22 | 2,394,746 | $7,878,714[9] | $6.06 |

[9] Grant date fair value of stock awards as represented on page 56 of the 2023 Proxy

54

Verified Shareholder Derivative Complaint

| | | | |
|---|---|---|---|
| defendant, former CEO, President & Chair of the Board | | | |
| | 3/2/23 | 70,360 | $84,279.00 | $1.91 |
| | 3/2/23 | 175,887 | $211,708.36 | $1.91 |
| | 4/3/23 | 58,629 | $76,576.39 | $2.11 |
| | 4/3/23 | 23,451 | $30,629.77 | $2.11 |
| | 5/1/23 | 58,629 | $73,711.02 | $2.04 |
| | 5/1/23 | 23,451 | $29,483.65 | $2.04 |
| | 6/1/23 | 58,629 | $99,066.83 | $2.73 |
| | 6/1/23 | 23,451 | $39,625.72 | $2.73 |
| | 7/3/23 | 58,629 | $120,400.51 | $3.31 |
| | 7/3/23 | 23,451 | $48,158.97 | $3.31 |
| | 8/1/23 | 58,629 | $120,898.86 | $3.10 |
| | 8/1/23 | 23,451 | $48,358.31 | $3.10 |
| | 9/1/23 | 58,629 | $86,161.18 | $2.18 |
| | 9/1/23 | 23,451 | $34,463.59 | $2.18 |
| | 10/2/23 | 58,629 | $70,073.38 | $1.77 |
| | 10/2/23 | 23,451 | $28,028.64 | $1.77 |
| | 11/9/23 | 58,629 | $56,846.68 | $1.44 |
| | 11/9/23 | 23,451 | $22,738.09 | $1.44 |
| | 12/1/23 | 58,629 | $63,149.30 | $1.64 |
| | 12/1/23 | 23,451 | $25,259.07 | $1.64 |
| | **TOTAL Stock Options:** | **3,379,713 options** | **$9,248,331.32** | |
| | 3/2/23 | 163,223 RSUs | $311,756.00 | |
| | 3/2/23 | 408,058 RSUs | $779,391.00 | |
| | **TOTAL RSUs:** | **571,281** | **$1,091,147.00**[10] | |
| *Michael Doyle*, defendant, former CFO | 3/25/22 | 425,811 | $1,401,002 | $6.06 |
| | 3/25/22 | 32,990 | $108,537 | $6.06 |
| | 3/25/22 | 67,010 | $220,463 | $6.06 |
| | 3/2/23 | 44,535 | $54,218.00 | $1.91 |
| | 3/2/23 | 17,812 | $21,335.78 | $1.91 |

Statement, rounded to the nearest whole dollar: "amounts reported represent the fair value per share as of the grant date determined in accordance with ASC Topic 718, multiplied by the number of shares awarded. The assumptions used in calculating the grant date fair value of the stock options reported under the "Option Awards" column are set forth in Note 2 to the audited consolidated financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2022."

[10] See pg. 61 of the 2024 Proxy Statement under "Stock Awards" column of the "2023 Summary Compensation Table."

Verified Shareholder Derivative Complaint

| | | | | |
|---|---|---|---|---|
| | 4/3/23 | 14,842 | $19,487.85 | $2.11 |
| | 4/3/23 | 5,937 | $7,754.42 | $2.11 |
| | 5/1/23 | 14,842 | $18,660.03 | $2.04 |
| | 5/1/23 | 5,937 | $7,464.26 | $2.04 |
| | 6/1/23 | 14,842 | $25,078.88 | $2.73 |
| | 6/1/23 | 5,937 | $10,031.89 | $2.73 |
| | 7/3/23 | 14,842 | $30,479.53 | $3.31 |
| | 7/3/23 | 5,937 | $12,192.22 | $3.31 |
| | 8/1/23 | 14,842 | $30,605.69 | $3.10 |
| | 8/1/23 | 5,937 | $12,242.69 | $3.10 |
| | 9/1/23 | 14,842 | $21,811.80 | $2.18 |
| | 9/1/23 | 5,937 | $8,725.02 | $2.18 |
| | 10/2/23 | 14,842 | $17,739.16 | $1.77 |
| | 10/2/23 | 5,937 | $7,095.90 | $1.77 |
| | 11/9/23 | 14,842 | $14,390.80 | $1.44 |
| | 11/9/23 | 5,937 | $5,756.52 | $1.44 |
| | **TOTAL Stock Options:** | **754,390** | **$2,055,072[11]** | |
| | 3/2/23 | 41,322 | $78,925.00 | |
| | 3/2/23 | 103,306 | $197,314.00 | |
| | **TOTAL RSUs:** | **144,628** | **$276,239** | |
| ***J. William Gurley***, defendant, Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | **TOTAL Stock Options:** | **123,517** | | |
| ***Jason Pressman***, defendant, Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |

---

[11] See pg. 61 of the 2024 Proxy Statement under "Stock Awards" column of the "2023 Summary Compensation Table." This figure matches the sum of the option awards provided to Defendant Doyle during the 2022 and 2023 Fiscal Years ($325,070 for the 2023 Fiscal Year and $1,730,002 for the 2022 Fiscal Year.)

Verified Shareholder Derivative Complaint

| | | | | |
|---|---|---|---|---|
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | **TOTAL Stock Options:** | **123,517** | | |
| *Mary Meeker*, defendant, Former Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | **TOTAL Stock Options:** | **123,517** | | |
| *Chris Varelas*, defendant, Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | **TOTAL Stock Options:** | **123,517** | | |
| *David Sze*, defendant, Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |

57

Verified Shareholder Derivative Complaint

| | | | | |
|---|---|---|---|---|
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | TOTAL Stock Options: | 123,517 | | |
| **John Hope Bryant**, defendant, Former Director | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | TOTAL Stock Options: | 74,152 | | |
| **Nirav Tolia**, defendant, CEO, Director | 8/19/22 | 24,647 | | $3.34 |
| | 9/1/23 | 24,717 | | $2.18 |
| | 10/2/23 | 8,239 | | $1.77 |
| | 11/1/23 | 8,239 | | $1.76 |
| | 12/1/23 | 8,240 | | $1.64 |
| | 1/2/24 | 8,239 | | $1.74 |
| | 2/1/24 | 8,239 | | $1.61 |
| | 3/1/24 | 8,239 | | $2.18 |
| | 4/1/24 | 8,239 | | $2.24 |
| | 5/1/24 | 8,239 | | $2.12 |
| | 6/3/24 | 8,240 | | $2.53 |
| | TOTAL Stock Options: | 123,517 | | |
| | 4/3/24 | 5,010,020 RSUs | | |
| | 4/3/24 | 5,010,020 RSUs | | |
| | TOTAL RSUs: | 10,020,040 RSUs | | |

172.   Moreover, as a result of the shareholders approving the Merger itself, in total to date, the Individual Defendants received staggering material personal benefits pursuant to the Merger as a result of shareholders approving the Merger under false

Verified Shareholder Derivative Complaint

pretenses. Several of the Individual Defendants' personal holdings of Legacy Nextdoor common stock and KV Acquisition II Company's common stock were automatically converted into shares of Nextdoor common stock pursuant to the consummation of the Merger, and several Individual Defendants received vast grants of stock options, some of which vested immediately upon the Merger closing in November 2021.

173. The Merger Proxy Statement emphasized Legacy Nextdoor's "[g]lobal flywheel of growth," and represented that the Company would "continue to drive growth and engagement." The Merger Proxy Statement also represented that the COVID-19 pandemic "amplified" engagement on the platform and altered consumer behavior "for good," spawning positive impacts that were "real and lasting" for Legacy Nextdoor's business, stating in relevant part:

> Our need to be connected to neighbors was amplified during the pandemic – and *that need is real and lasting*. For the three months ended June 30, 2021, neighbors who engaged with Nextdoor daily posted 2.1 times more often than in the same prior year period. As the world reopens, consumer behavior is changed for good, with an increased focus on local.

174. The Merger Proxy Statement also stated that Legacy Nextdoor's total addressable market was "[l]arge and growing," and the Company's total global digital advertising market was "estimated at $355 billion in 2020" and anticipated to grow "71% to $607 billion by 2024." The Merger Proxy Statement further maintained that despite Legacy Nextdoor having "grown rapidly since [its] inception," the Company remained in the "early stages of monetization" and possessed "many vectors for sustained revenue growth." The Merger Proxy Statement also represented that Legacy Nextdoor's revenue was projected to grow from $178 million for the 2021 Fiscal Year to $249 million for the 2022 Fiscal Year (constituting 40% annual revenue growth) and its ARPU was expected to grow from $5.93 in the 2021 Fiscal Year to $6.47 in the 2022 Fiscal Year (constituting 9% annual growth).

Verified Shareholder Derivative Complaint

175.   The Merger Proxy stated that KV Acquisition Company II "conducted a detailed business and financial due diligence review of Nextdoor" such as "business and financial due diligence, including several diligence meetings focused on Nextdoor's financial plan."

176.   The statements referenced in ¶ 175 were materially false and misleading because KV Acquisition Company II misrepresented its due diligence efforts of Legacy Nextdoor by exaggerating that it had conducted "a detailed business and financial due diligence review."

177.   Under the section titled "Projected Financial Information," the Merger Proxy included the following financial projections:

| ($ in millions) | 2021E | 2022E |
|---|---|---|
| Total Revenue | $ 178 | $ 249 |
| Total ARPU | $ 5.93 | $ 6.47 |
| Operating Expenses | $ 280 | $ 352 |
| Net Loss | $ (103) | $ (103) |
| Non-GAAP Operating Expenses[1] | $ 228 | $ 294 |
| Adjusted EBITDA[2] | $ (50) | $ (45) |

178.   The statements and representations referenced in ¶ 177 were materially false and misleading because such projections failed to account for the fact that Nextdoor did not have a total addressable market of 312 million households, that the unique impact COVID-19 had on Legacy Nextdoor's growth trends would not continue, that Legacy Nextdoor's growth trends were already reversing by July 2021, and that the U.S. market—Nextdoor's most important market—was oversaturated before the Merger.  As such, the projections set forth in the Merger Proxy Statement for the 2021 and 2022 Fiscal Years were false. These projections were not based on any reasonable assumptions.

179.   The Merger Proxy Statement also misrepresented the value of KV Acquisition Company II shares leading up to the Merger by stating that the post-Merger

Verified Shareholder Derivative Complaint

Company's Class B common stock would be "at a deemed value of $10.00 per share."

180. The statements referenced in ¶ 179 were materially false and misleading In truth, the value of Legacy Nextdoor's shares was inflated. Consequently, and unsurprisingly, after the Merger, as investors became aware of the Company's inability to meet the inflated projections made in the Merger Proxy Statement and in earlier disclosures, the Company's stock price took a nosedive. In truth, the only way that KV Acquisition Company II shareholders' shares would have been worth $10 was if they redeemed their shares and did not take part in the Merger.

181. When the Merger closed, KV Acquisition Company II directors and officers with interests in the Sponsor and Founders Shares obtained over $103 million—a windfall amount 4,120x greater than the Sponsor's initial $25,000 investment.

182. The Individual Defendants caused the Merger Proxy Statement to be materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading, because the Merger Proxy Statement failed to disclose, *inter alia*: (1) Nextdoor did not have a total addressable market of 312 million households; (2) the COVID-19 pandemic fueled the Company's dramatic growth trends, including advertising growth, but the growth trends brought on by the pandemic had already reversed and were actually hampering, and would continue to hamper, Nextdoor's future advertising growth; (3) as a result, the Company's growth trends were already reversing by July 2021; (4) as a further result, the U.S. market—Nextdoor's most important market—was already oversaturated before the Merger; (5) Nextdoor's revenue trajectory and guidance were materially overstated; (6) KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger was wholly inadequate; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

183. The Merger Proxy Statement explicitly maintained that the KV

Acquisition Company II Board unanimously supported the Merger after having "consulted with the Sponsor, [KV Acquisition Company II]'s management and its legal and other advisors," and found that the transactions solicited in the Merger Proxy Statement were "advisable, fair to and in the best interests of [KV Acquisition Company II] and its stockholders[.]" The KV Acquisition Company II Board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy Statement.

184. The Merger Proxy Statement also disclosed the unanimous support and recommendation of the Board of Legacy Nextdoor, who also solicited shareholder approval for the Merger and related proposals in the Merger Proxy Statement.

185. As a result of the material misstatements and omissions contained in the Merger Proxy Statement, Company shareholders voted to: (1) approve the Merger; and (2) approve the 2021 Plan.

186. Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, KV Acquisition Company II shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

### October 26, 2021 Press Release

187. On October 26, 2021, Legacy Nextdoor issued a press release reporting certain financial results for the third quarter ending September 30, 2021 for the 2021 Fiscal Year (the final quarter before the Merger) ("September 2021 Press Release"). The September 2021 Press Release reported 66% year-over-year increase in quarterly revenues to $52.7 million, 38% increase in ARPU year-over-year to $1.61, and 20% year-over-year increased in WAU to 33 million. The September 2021 Press Release stated that these financial "highlights" showed Legacy Nextdoor's "continued growth at scale." The September 2021 Press Release also contained a quote from Defendant

Friar, who praised the Company's third quarter financial "'highlights,'" further representing that the results demonstrated "'growth at scale of our community of neighbors, businesses, and public services, and our ability to drive increased monetization.'"

### October 26, 2021 Conference Call

188.   That same day, on October 26, 2021, Legacy Nextdoor held a conference call, via LinkedIn Live stream, regarding the Company's business model and performance. During the conference call, Defendant Friar stressed Legacy Nextdoor's third quarter financial results and financial guidance, representing in relevant part:

> Our revenue grew 66% year-over-year. So that was – on par with what we saw in Q2. So the ***business is really humming right now***. And we also raised our overall growth guidance. ***So we've been on a roll through 2021***. When we did our PIPE back in July, we said 44% year-over-year growth for the year in 2021. In September, we raised that again, the 47%. And, now, we're guiding to say we'll grow faster than we did in 2020 – 20 – 2020 which was 49% year-over-year.

189.   Likewise, Defendant Doyle maintained that the Company's financial results for the third quarter of the 2021 Fiscal Year proved Legacy Nextdoor's "success" at fostering growth at scale and monetization efforts, in addition to the Company's capability to "sustain a very high rate of growth." Defendant Doyle also emphasized Legacy Nextdoor's upward engagement trends, exclaiming that he was "excited at the momentum that creates in the remainder of the year and into – into the next." Defendant Doyle also said that he was "excited" by the "rate of revenue growth" of Legacy Nextdoor.

### November 10, 2021 Shareholder Letter

190.   After the Merger was completed, on November 10, 2021, Nextdoor filed a shareholder letter on Form 8-K with the SEC. The letter reported Nextdoor's financial results for the third quarter of the 2021 Fiscal Year (the "September 2021 Letter"). The September 2021 Letter told shareholders that during the third quarter of the 2021 Fiscal

Year, Legacy Nextdoor's WAUs rose 20% year-over-year to 33 million, with ARPU increasing by 38% year-over-year to $1.61. In discussing these performance metrics, the September 2021 Letter referenced Legacy Nextdoor's "significant momentum," the Company's "growth at scale," and the Company's "ability to drive increased monetization." The September 2021 Letter stressed that Nextdoor was enjoying "[c]ontinued customer demand" and asserted that the Company had an "effective" strategy "proven" at "delivering sustained growth." The September 2021 Letter also represented that Nextdoor's "strong network effects" were "increasing," and in result, powering sustained growth.

### *November 10, 2021 Conference Call*

191. That same day, on November 10, 2021, Nextdoor hosted an earnings conference call with analysts and investors to discuss Nextdoor's financial results for the third quarter of the 2021 Fiscal Year. During the conference call, Defendant Friar reasserted that the Company's potential was "large," and that previous growth was "repeatable," stating in relevant part:

> ***Our total addressable market is large and global***. In the third quarter, international WAUs represented 18% of total, an increase from 15% in the prior year quarter. We're seeing retention and engagement in line with the United States, which highlights thast the utility of our platform is globally relevant. For example, in our most recently launched market, Canada, we saw WAU growth of over 100% year-over-year in Q3, ***giving us confidence that our strategy is scalable and repeatable***.

192. Also, during the call, Defendant Doyle stated that the Company had a "strong performance across all advertising verticals" and asserted that the third quarter proved "growth in [the] community, both in total members and in engagement." When answering a question about Nextdoor's engagement metrics, Defendant Friar represented that Nextdoor was "quite proud" of its 20% WAU growth, while also stating that other social media platform competitors had a "downtick" after posting strong comparable periods because of COVID-19 impacts, while the Company, in contrast,

Verified Shareholder Derivative Complaint

enjoyed its "highest level of WAUs ever."

193.    The above statements referenced in ¶ 154-169 and 187-192 regarding the business, operations, and prospects of the Company were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Individual Defendants were engaged in the Overpayment Misconduct; (2) Nextdoor did not have a total addressable market of 312 million households; (3) the COVID-19 pandemic fueled the Company's dramatic growth trends, including advertising growth, but the growth trends brought on by the pandemic had already reversed and were actually hampering, and would continue to hamper, Nextdoor's future advertising growth; (4) as a result, the Company's growth trends were already reversing by July 2021; (5) as a further result, the U.S. market—Nextdoor's most important market—was already oversaturated before the Merger; (6) Nextdoor's revenue trajectory and guidance were materially overstated; and (7) KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger was wholly inadequate.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

*March 1, 2022 Shareholder Letter*

194.    On March 1, 2022, the truth began to emerge when the Company filed a shareholder letter which reported Nextdoor's financial results for the fourth quarter and full 2021 Fiscal Year (the quarter in which the Merger was consummated) (the "March 2022 Letter"). Contradicting their own previous representations about Nextdoor's continuing growth trends, Nextdoor reported a 18% to 48% year-over-year decline in the Company's revenue growth rate for the fourth quarter of the 2021 Fiscal Year. This decline marked a dramatic departure from the Company's 66% growth rate in the quarter before the shareholders approved the Merger. Additionally, Nextdoor reported quarterly a significant decline in ARPU as well, which dropped by 26%, coming in at $1.65. Moreover, the March 2022 Letter reported that the ARPU growth rate was just

12% year-over-year growth from 38% growth in the third quarter of the 2021 Fiscal Year—thereby revealing that the capabilities of Nextdoor's business model were weak.

195. On this news, Nextdoor's Class A common stock fell about 14% per share, from $6.24 per share on March 1, 2022, to $5.39 per share on March 4, 2022 on abnormally high trading volume. Yet, the price of Nextdoor's Class A common stock remained artificially inflated as the Individual Defendants continued to make materially false and misleading statements and omissions.

***March 1, 2022 Shareholder Letter***

196. The March 2022 Letter also contained false and misleading statements. For instance, the March 2022 Letter stated that the Company's platform achieved an "all-time high" for user engagement in the fourth quarter of the 2021 Fiscal Year and that Nextdoor was enjoying "accelerating growth," stating in relevant part:

> In Q4, 52% of neighbors globally were active weekly, reflecting an increase of 5 percentage points year-over-year and an all-time high. . . .
>
> ***We finished 2021 with significant momentum***. In Q4, WAU grew 32% year-over-year and 9% quarter-over-quarter, ***continuing the trajectory of accelerating growth*** and reflecting the early effects of our product focus on creating an Active Valued Community. In fact, through the second half of 2021, we added more WAU than in any other equivalent period in Nextdoor's history.
>
> ***We accelerated full year revenue growth from 49% in 2020 to 56% in 2021***. Healthy demand across customer sizes, verticals, and campaign objectives drove our 48% year-over-year revenue growth in Q4. ARPU grew 12% year-over- year in Q4 to $1.65, contributing to strong full year 2021 ARPU growth of 33%. ARPU growth reflected a combination of higher neighbor engagement and higher eCPMs5. ***Sustained revenue growth at scale, coupled with a 6 point improvement in Q4 adjusted EBITDA margin and an 18 point improvement in 2021 adjusted EBITDA margin, demonstrates our path to long-term profitability, even as we remain in investment mode***.

197. The March 2022 Letter also lifted Nextdoor's revenue guidance for the 2022 Fiscal Year: "Revenue is expected to be between $254M-$256M. This is an increase from our prior full year 2022 guidance of $252M."

### *March 1, 2022 Conference Call*

198. Also, on that same day, March 1, 2022, Nextdoor hosted an earnings conference call with analysts and investors to discuss Nextdoor's financial performance for the fourth quarter and full 2021 Fiscal Year. During the conference call, Defendant Friar emphasized the Company's "best-in-class" organic user base growth, stating that "when we look at 2022, what you see is shifting a little bit more of our paid marketing spend into international because we feel really good about what the product pipeline is doing build growth and engagement in the U.S."

### *March 15, 2022 Form 10-K*

199. On March 15, 2022, Nextdoor filed an annual report on Form 10-K for the 2021 Fiscal year with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Friar, Doyle, Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom.

200. Attached to the 2021 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Friar and Doyle attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

201. The 2021 10-K featured the same important financial figures as contained in the March 2021 Letter as discussed above.

202. The above statements referenced in ¶ 196-201 regarding the business, operations, and prospects of the Company were materially false and misleading. Specifically, the Individual Defendants failed to disclose, inter alia, that: (1) the Individual Defendants were engaged in the Overpayment Misconduct; (2) Nextdoor did not have a total addressable market of 312 million households; (3) the COVID-19

pandemic fueled the Company's dramatic growth trends, including advertising growth, but the growth trends brought on by the pandemic had already reversed and were actually hampering, and would continue to hamper, Nextdoor's future advertising growth; (4) as a result, the Company's growth trends were already reversing by July 2021; (5) as a further result, the U.S. market—Nextdoor's most important market—was already oversaturated before the Merger; (6) Nextdoor's revenue trajectory and guidance were materially overstated; and (7) KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger was wholly inadequate.

**The Truth Continues to Emerge as False and Misleading Statements Continue**

*May 10, 2022 Form 10-Q*

203.  On May 10, 2022, the truth continued to emerge when Nextdoor filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial results for the first quarter ended March 31, 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q revealed a dramatic crumbling of the Company's WAUs during the quarter, including that Nextdoor's international WAUs growth had risen just 1% sequentially (from 32% year-over-year growth in the fourth quarter of the 2021 Fiscal Year to 33% year-over-year growth in the first quarter of the 2022 Fiscal Year) and that WAUs in the U.S. experienced a sequential decline of about 100,000 users.

204.  Morgan Stanley analyst, in a report published after the release of the Q1 2022 10-Q, stressed that the Company had "A User Problem" and explained that WAU trends were "weighing on the multiple the market [was] willing to pay."

205.  On this news, Nextdoor's Class A common stock fell about 8% per share, from $3.19 per share on May 10, 2022, to $2.93 per share on May 11, 2022 on abnormally high trading volume. Yet, the price of Nextdoor's Class A common stock remained artificially inflated as the Individual Defendants continued to make materially false and misleading statements and omissions.

*May 10, 2022 Shareholder Letter*

206.   Also, that same day, on May 10, 2022, the Company filed a shareholder letter with the SEC which reported Nextdoor's financial performance for the first quarter of the 2022 Fiscal Year (the "May 2022 Letter"). The May 2022 Letter stated that quarterly revenue rose 48% year-over-year to $51 million, with WAUs growing 33% year-over-year to 36.7 million, and with ARPU growing 12% year-over-year to $1.39. The May 2022 Letter further represented that the Company's users were "increasingly engaged" and that Nextdoor was enjoying "increased advertiser demand." The May 2022 Letter widened Nextdoor's revenue guidance for the 2022 Fiscal Year to a range between $252 million and $256 million.

*May 10, 2022 Form 10-Q*

207.   The Q1 2022 10-Q also contained false and misleading statements. Attached to the Q1 2022 10-Q were SOX certifications signed by Defendants Friar and Doyle attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

208.   The Q1 2022 10-Q featured the same important financial figures as contained in the May 2022 Letter as discussed above. For instance, the Q1 2022 10-Q stated that the Company had attained 29.4 million U.S. WAUs during the first quarter of the 2022 Fiscal Year.

*May 10, 2022 Conference Call*

209.   That same day, on May 10, 2022, the Company hosted an earnings conference call with analysts and investors to discuss Nextdoor's financial performance for the first quarter of the 2022 Fiscal Year. During the conference call, Defendant Friar stated that Nextdoor's users were still "highly engaged" and that the Company's business strategy was "working," stating in relevant part:

> Our community is active and becoming increasingly active. Our product strategy in 2022 is centered on strengthening engagement through building an

active valued community. ***It's working***. In Q1, over 50% of neighbors were weekly active and over half of weekly active users were active daily, highlighting that as we move neighbors from onboarding to monthly to weekly, they have a high propensity to make Nextdoor a daily use case.

Everyone is a neighbor. ***Our continued strength in international growth underscores that this is a global opportunity***, solidifying our confidence in the opportunity ahead. In Q1, international WAU grew 55% year-over-year, accelerating quarter-over-quarter from 47% in Q4 and year-over-year from 39% in Q1 of 2021. In international, engagement metrics surpassed even the U.S. with 55% of neighbors active weekly. In 2022, we will remain focused on driving growth and engagement in our existing international markets.

210.    Defendant Doyle similarly added, during the call, that the Company saw "healthy demand" from advertisers and "deeper engagement" from users.

211.    The above statements referenced in ¶ 206-210 regarding the business, operations, and prospects of the Company were materially false and misleading. Specifically, the Individual Defendants failed to disclose, inter alia, that: (1) the Individual Defendants were engaged in the Overpayment Misconduct; (2) Nextdoor did not have a total addressable market of 312 million households; (3) the COVID-19 pandemic fueled the Company's dramatic growth trends, including advertising growth, but the growth trends brought on by the pandemic had already reversed and were actually hampering, and would continue to hamper, Nextdoor's future advertising growth; (4) as a result, the Company's growth trends were already reversing by July 2021; (5) as a further result, the U.S. market—Nextdoor's most important market—was already oversaturated before the Merger; (6) Nextdoor's revenue trajectory and guidance were materially overstated; and (7) KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger was wholly inadequate.

**The Truth Continues to Emerge as False and Misleading Statements Continue**

***August 9, 2022 Form 10-Q***

212.    On August 9, 2022, the truth continued to emerge when Nextdoor filed a

quarterly report on Form 10-Q with the SEC announcing the Company's financial results for the second quarter ended June 30, 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q revealed that the Company's platform continued to stumble dramatically. Specifically, the Q2 2022 10-Q revealed that revenue was only 19% year-over-year during the second quarter of the 2022 Fiscal Year and that the Company's U.S. WAUs had fallen for the second consecutive quarter to 29.2 million. The Q2 2022 10-Q also further revealed that Nextdoor's ARPU growth fell into the negatives for the quarter, shrinking by 6% year-over-year.

### *August 9, 2022 Conference Call*

213. That same day, the Company held an earnings conference call with analysts and investors to discuss Nextdoor's financial performance for the second quarter of the 2022 Fiscal Year. During the conference call, Defendant Doyle revealed that Nextdoor planned to chop revenue guidance for the 2022 Fiscal Year by more than $31 million at the midpoint, or about 12%, to a range between $220 million and $225 million.

214. On this news, Nextdoor's Class A common stock fell about 25% per share, from $3.60 per share on August 9, 2022, to $2.70 per share on August 10, 2022 on abnormally high trading volume. Yet, the price of Nextdoor's Class A common stock remained artificially inflated as the Individual Defendants continued to make materially false and misleading statements and omissions.

### *August 9, 2022 Shareholder Letter*

215. Also, that same day, on August 9, 2022, the Company filed a shareholder letter with the SEC which reported Nextdoor's financial performance for the second quarter of the 2022 Fiscal Year (the "August 2022 Letter"). The August 2022 Letter stated that the Company's international WAUs grew 26%, "reflect[ing] ongoing momentum internationally." The August 2022 Letter cited "complex macroeconomic conditions" as reasons for the Company's financial performance and further suggested

that users were turning to the Company's platform as they previously had in 2020 and 2021, stating in relevant part:

> We have said this before, and it bears repeating: the power of local is unparalleled. We saw this in 2020 as neighbors helped keep each other safe during the start of the COVID-19 pandemic. We saw this in 2021 as neighbors gathered with their communities and supported their local businesses when the world started to reopen. ***We see this again now***. Neighbors are using the platform to find jobs and side hustles. They are using our classifieds surface, For Sale & Free, with an increasing frequency, to find cheaper alternatives to buying new and helping others in need – in fact, in Q2 2022, over 25% of all items in For Sale & Free were marked as free. They are finding ways to help those less fortunate by raising money and other donations. This neighbor behavior continues to affirm our value proposition and bolsters the foundation upon which we will continue to build, globally, the neighborhood network.

### August 9, 2022 Form 10-Q

216. The Q2 2022 10-Q also contained false and misleading statements. Attached to the Q2 2022 10-Q were SOX certifications signed by Defendants Friar and Doyle attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

217. The Q2 2022 10-Q featured the same important financial figures as contained in the August 2022 Letter as discussed above. For instance, the Q2 2022 10-Q stated that the Company had attained 29.2 million U.S. WAUs during the second quarter of the 2022 Fiscal Year.

### August 9, 2022 Conference Call

218. That same day, on August 9, 2022, the Company hosted an earnings conference call with analysts and investors to discuss Nextdoor's financial performance for the second quarter of the 2022 Fiscal Year. During the conference call, Defendant Friar stated that there was "durable" engagement among Nextdoor's users and that this trend "show[ed]" that Nextdoor's efforts to address user engagement were "working," stating in relevant part:

Weekly active users, or WAU, grew 26% year-over-year to approximately 37 million. ***We're seeing durable engagement trends amongst our most active users.*** In Q2, over 50% of weekly active users were active daily. Across all regions, growth in total sessions accelerated 10 points quarter-over-quarter. ***These trends show that our focus on engagement through the introduction of new machine learning models for increased personalization, more engaging notification, a simplified user experience and welcoming platform initiatives is working***. With the progress we've made on engagement, we are now shifting more of our product focus to new neighbor growth. Today, we have over 75 million Verified Neighbors on the platform, and ***we're just scratching the surface of our global total addressable market.***

219. The above statements referenced in ¶ 215-218 regarding the business, operations, and prospects of the Company were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Individual Defendants were engaged in the Overpayment Misconduct; (2) Nextdoor did not have a total addressable market of 312 million households; (3) the COVID-19 pandemic fueled the Company's dramatic growth trends, including advertising growth, but the growth trends brought on by the pandemic had already reversed and were actually hampering, and would continue to hamper, Nextdoor's future advertising growth; (4) as a result, the Company's growth trends were already reversing by July 2021; (5) as a further result, the U.S. market—Nextdoor's most important market—was already oversaturated before the Merger; (6) Nextdoor's revenue trajectory and guidance were materially overstated; and (7) KV Acquisition Company II's due diligence of Legacy Nextdoor in connection with the proposed Merger was wholly inadequate.

## The Truth Fully Emerges

### *November 8, 2022 Form 10-Q*

220. On November 8, 2022, the truth fully emerged when the Company reported its financial performance for the third quarter of the 2022 Fiscal Year in a Form 10-Q ("Q3 2022 10-Q"). The Q3 2022 10-Q revealed that the Company's performance kept crumbling. Specifically, Q3 2022 10-Q the revealed that the Company's revenues for

73

Verified Shareholder Derivative Complaint

the third quarter of the 2022 Fiscal Year fell sequentially by $1 million to $54 million, representing just 2% year-over-year growth, and that Nextdoor's quarterly ARPU growth shrunk by 12% compared to the third quarter of the 2021 Fiscal Year.

### *November 8, 2022 Conference Call*

221.    That same day, on November 8, 2022, the Company hosted an earnings conference call with analysts and investors to discuss Nextdoor's financial performance for the third quarter of the 2022 Fiscal Year. During the conference call, Defendant Doyle revealed that the Company was cutting revenue guidance again, this time by another $12 million, and that the Company now anticipated that 2022 Fiscal Year revenues would only total $210.5 million at the midpoint, a figure much less than the $256 million figure given during the Relevant Period.

222.    On this news, the Company's share price dropped $0.26 (or 11%) from a close of $2.32 per share on November 8, 2022 to a close of $2.06 per share on November 9, 2022.

### **REPURCHASES DURING THE RELEVANT PERIOD**

223.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $77.2 million*** to repurchase approximately 23,251,703 shares of its own common stock at artificially inflated prices from June 2022 through September 2022.

224.    According to the Form 10-Q the Company filed with the SEC on August 9, 2021 (the "2Q 2022 10-Q"), between June 1, 2022, and June 30, 2022, the Company purchased 3,061,092 shares of its common stock for approximately $10,499,545.60 at an average price of $3.43 per share.

225.    As the Company's stock was actually only worth $2.06 per share, the price at closing on November 8, 2022, the Company overpaid by approximately

Verified Shareholder Derivative Complaint

$4,193,696.08 for repurchases of its own stock between June 1, 2022, and June 30, 2022.

226. According to the Form 10-Q the Company filed with the SEC on November 8, 2022 (the "3Q 2022 10-Q"), between July 1, 2022, and July 31, 2022, the Company purchased 4,547,680 shares of its common stock for approximately $16,508,078.04 at an average price of $3.63 per share.

227. As the Company's stock was actually only worth $2.06 per share, the price at closing on November 8, 2022, the Company overpaid by approximately $11,960,396 for repurchases of its own stock between July 1, 2022, and July 31, 2022.

228. According to the 3Q 2022 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 6,938,173 shares of its common stock for approximately $22,757,207.44 at an average price of $3.28 per share.

229. As the Company's stock was actually only worth $2.06 per share, the price at closing on November 8, 2022, the Company overpaid by approximately $14,292,636.38 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

230. According to the 3Q 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 8,704,758 shares of its common stock for approximately $27,507,035.28 at an average price of $3.16 per share.

231. As the Company's stock was actually only worth $2.06 per share, the price at closing on November 8, 2022, the Company overpaid by approximately $9,575,233.80 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

232. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *over $40 million.*

## DAMAGES TO NEXTDOOR

233. As a direct and proximate result of the Individual Defendants' misconduct,

Verified Shareholder Derivative Complaint

Nextdoor has lost and will continue to lose and expend many millions of dollars.

234.  Such losses include overpayment made by the Company in consideration of the Merger.

235.  Such losses include compensation paid to the Individual Defendants pursuant to the 2021 Plan.

236.  Such expenditures include, but are not limited to, fees associated with the Securities Class Action, and any internal investigations, legal advisory, and other professional service fees incurred in defending any investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

237.  Such losses include the Company's overpayment of more than $77.2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

238.  Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants.

239.  As a direct and proximate result of the Individual Defendants' conduct, Nextdoor has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and Individual Defendants' misrepresentations.

## DERIVATIVE ALLEGATIONS

240.  Plaintiff brings this action derivatively and for the benefit of Nextdoor to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act, breaches of fiduciary duties and other violations thereof, including aiding and abetting the same.

241.  Nextdoor is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

242.  Plaintiff is, and has been at all relevant times, a shareholder of Nextdoor.

Verified Shareholder Derivative Complaint

Plaintiff will adequately and fairly represent the interests of Nextdoor in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

243. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

244. A pre-suit demand on the Board of Nextdoor is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following ten individuals: Defendants Gurley, Pressman, Sze, Varelas, and Tolia (the "Director Defendants") and non-parties Dana Evan, Niraj Shah, Marissa Mayer, Robert Hohman, and Elisa Steele (collectively with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of these ten Directors.

245. Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $40 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

246. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Overpayment Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

77

Verified Shareholder Derivative Complaint

247. Demand is also excused as to the Director Defendants because, pursuant to the Merger Proxy Statement, shareholders were asked to approve their future compensation through approving the 2021 Plan, which reserved shares of the Company's common stock to be used in the future for, among other things, the benefit of the Directors. These financial incentives have precluded the Director Defendants from acting in the best interests of the shareholders, as they have failed to correct the false and misleading statements and omissions contained in the Merger Proxy Statement, the solicitation of which they materially benefitted from since it resulted in their election as Company directors and shareholder approval of the 2021 Plan.

248. To date, Director-Defendants Gurley, Pressman, Sze, Varelas, and Tolia, as well as nonparty Evan, have received material personal benefits under the 2021 Plan as a result of the Individual Defendants' solicitation of the false and misleading Merger Proxy Statement which called for shareholder approval of the 2021 Plan. Shareholders would not have approved the 2021 Plan had they known the true state of affairs at the Company or at Legacy Nextdoor. As a result of shareholder approval of the 2021 Plan, Director Defendants Gurley, Pressman, Sze, Tolia, and Varleas each received $52,005 worth of stock option awards during the 2022 Fiscal Year.[12] During the 2023 Fiscal Year, Director Defendants Gurley, Pressman, Sze, Tolia, and Varelas each received $59,522 in option awards[13] from the Company pursuant to the 2021 Plan, and Director Evan received $332,748 in option awards pursuant to the 2021 Plan.[14] They all will continue to receive stock awards while they remain as directors. As a result, Directors Gurley, Pressman, Sze, Tolia, Varelas, and Evan cannot independently and disinterestedly assess a demand against each other as they have personally materially

[12] 24,647 shares of common stock underly the stock options granted for the 2022 Fiscal Year for Directors Gurley, Meeker, Pressman, Sze, Tolia, and Varleas. Each share has a grant date fair value of $2.10.
[13] As reported in the 2024 Proxy Statement (option awards).
[14] As reported in the 2024 Proxy Statement (option awards).

Verified Shareholder Derivative Complaint

benefited from, and continue to personally materially benefit from, the very misconduct they all participated in, as alleged herein. As such, demand upon the Director Defendants is futile and, therefore, excused.

249. Additional reasons that demand on Defendant Gurley is futile follow. Defendant Gurley has served as a Company director since the Merger. He also serves as a member of the Nominating, Corporate Governance and Corporate Responsibility Committee. He is also a founding investor of Legacy Nextdoor. As a trusted Company director, throughout the Relevant Period, Defendant Gurley was ultimately responsible for all the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the Company's SEC filings and current reports with attachments of press releases or investor presentations, as well as other public communications. He solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the 2021 Plan. Defendant Gurley's solicitation of the Merger Proxy Statement was integral to the accomplishment of the Individual Defendants' scheme to avoid a liquidation of the Trust and consummate the Merger. Indeed, the false and misleading statements and omissions in the Merger Proxy Statement led to the Merger to be consummated on time. In addition, Defendant Gurley solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger, the 2021 Plan, and his election as well as the elections of Director Defendants Pressman, Sze, Varelas, and Tolia to the Board. Such approvals allowed Defendant Gurley to reap significant profits off his investments in the Company while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gurley

Verified Shareholder Derivative Complaint

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.    Additional reasons that demand on Defendant Pressman is futile follow. Defendant Pressman has served as a Company director since the Merger. He also serves the Chairperson of the Compensation and People Development Committee and as a member of the Audit and Risk Committee. As a trusted Company director, throughout the Relevant Period, Defendant Pressman was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the Company's SEC filings and current reports with attachments of press releases or investor presentations, as well as other public communications. He solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the 2021 Plan. Defendant Pressman's solicitation of the Merger Proxy Statement was integral to the accomplishment of the Individual Defendants' scheme to avoid a liquidation of the Trust and consummate the Merger. Indeed, the false and misleading statements and omissions in the Merger Proxy Statement led to the Merger to be consummated on time. In addition, Defendant Pressman solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger, the 2021 Plan, and his election as well as the elections of Director Defendants Gurley, Sze, Varelas, and Tolia to the Board. Such approvals allowed Defendant Pressman to personally materially benefit from his directorship position and equity awards while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Pressman faces a substantial

Verified Shareholder Derivative Complaint

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251. Additional reasons that demand on Defendant Sze is futile follow. Defendant Sze has served as a Company director since the Merger. He also serves as the Chair of the Audit and Risk Committee and as a member of the Compensation and People Development Committee. As a trusted Company director, throughout the Relevant Period, Defendant Sze was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the Company's SEC filings and current reports with attachments of press releases or investor presentations, as well as other public communications. He solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the 2021 Plan. Defendant Sze's solicitation of the Merger Proxy Statement was integral to the accomplishment of the Individual Defendants' scheme to avoid a liquidation of the Trust and consummate the Merger. Indeed, the false and misleading statements and omissions in the Merger Proxy Statement led to the Merger to be consummated on time. In addition, Defendant Sze solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger, the 2021 Plan, and his election as well as the elections of Gurley, Pressman, Varelas, and Tolia to the Board. Such approvals allowed Defendant Sze to personally materially benefit from his directorship position and equity awards while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sze

Verified Shareholder Derivative Complaint

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252. Additional reasons that demand on Defendant Varelas is futile follow. Defendant Varelas has served as a Company director since the Merger. He also serves as the Chair of the Nominating, Corporate Governance and Corporate Responsibility Committee and as a member of the Audit and Risk Committee. As a trusted Company director, throughout the Relevant Period, Defendant Varelas was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the Company's SEC filings and current reports with attachments of press releases or investor presentations, as well as other public communications. He solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the 2021 Plan. Defendant Varelas's solicitation of the Merger Proxy Statement was integral to the accomplishment of the Individual Defendants' scheme to avoid a liquidation of the Trust and consummate the Merger. Indeed, the false and misleading statements and omissions in the Merger Proxy Statement led to the Merger to be consummated on time. In addition, Defendant Varelas solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger, the 2021 Plan, and his election as well as the elections of Director Defendants Gurley, Pressman, Sze, and Tolia to the Board. Such approvals allowed Defendant Varelas to personally materially benefit from his directorship position and equity awards while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Varelas faces a substantial likelihood of

Verified Shareholder Derivative Complaint

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253. Additional reasons that demand on Defendant Tolia is futile follow. Defendant Tolia has served as a Company director since the Merger. He is a co-founder of Legacy Nextdoor. Since May 8, 2024, Defendant Tolia has served as CEO and President of the Company and as Chairperson of the Board. As a trusted Company director, throughout the Relevant Period, Defendant Tolia was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, those contained in the Company's SEC filings and current reports with attachments of press releases or investor presentations, as well as other public communications. He solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the 2021 Plan. Defendant Tolia's solicitation of the Merger Proxy Statement was integral to the accomplishment of the Individual Defendants' scheme to avoid a liquidation of the Trust and consummate the Merger. Indeed, the false and misleading statements and omissions in the Merger Proxy Statement led to the Merger to be consummated on time. In addition, Defendant Tolia solicited the Merger Proxy Statement, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger, the 2021 Plan, and his election as well as the elections of Director Defendants Gurley, Pressman, Sze, and Varelas to the Board. Such approvals allowed Defendant Tolia to personally materially benefit from his directorship position and equity awards while effectuating the Overpayment Misconduct to the Company's detriment. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tolia faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

254. Additional reasons that demand on the Board is futile follow.

255. Under the 2021 Plan, which is administered by the Compensation and People Development Committee and was approved in connection with the Merger Proxy (which contained materially false and misleading statements), each of the Directors is eligible to receive long-term equity-based compensation, the amount and terms of which are approved by the Compensation and People Development Committee. The Compensation and People Development Committee is partially composed of Director Defendants Pressman and Sze. As such, Director Defendants Pressman and Sze are responsible for determining the compensation of the Directors. Given their conflicted positions, the Directors are unlikely to take action against those individuals, including the Director Defendants, who caused Company shareholders to approve a plan that the Directors have materially benefitted from and continue to materially benefit from. As a result, the Directors are unable to independently and disinterestedly assess a demand against Director Defendants Pressman and Sze, as they reply upon them for their compensation. Thus, demand upon the Directors is futile and, therefore, excused.

256. Moreover, certain of the Director Defendants had specified duties as members of Board committees, particularly those serving on the Audit & Risk Committee. Director Defendants Sze, Pressman, and Varelas further breached their additional duties they had as members of the Audit & Risk Committee to ensure the Company's disclosures were accurate, among other things. Therefore, demand upon Director Defendants Sze, Pressman, and Varelas is futile and therefore, further excused.

257. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the others who were responsible for that wrongful conduct to attempt

Verified Shareholder Derivative Complaint

to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

258.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, the Director Defendants cannot claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

259.   Thus, for all of the reasons set forth above, the Director Defendants and/or at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

260.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

261.   Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

262.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

263.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

85
Verified Shareholder Derivative Complaint

264. In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Overpayment Misconduct.

265. In further breach of their fiduciary duties, the Individual Defendants made false and misleading statements and omissions and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

266. In yet further breach of fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase more than 23 million shares of its own common stock at artificially inflated prices before the fraud was exposed.

267. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

268. The Individual Defendants had actual or constructive knowledge of the Overpayment Misconduct and the materially false and misleading statements that enabled it, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

269. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless

86

disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

270. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

271. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nextdoor has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

272. Plaintiff on behalf of Nextdoor have no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

273. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

274. The Individual Defendants, by virtue of their positions with Nextdoor and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Nextdoor and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Nextdoor to engage in the illegal conduct and practices complained of herein.

275. Plaintiff, on behalf of Nextdoor, has no adequate remedy at law.

## THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

Verified Shareholder Derivative Complaint

276. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

277. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Nextdoor. Not only is Nextdoor now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Nextdoor by the Individual Defendants. The Individual Defendants caused by the Company to repurchase more than 23.2 million of its own shares at artificially inflated prices, damaging Nextdoor.

278. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Nextdoor not misleading.

279. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Nextdoor.

280. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the

scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

281.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

282.   Plaintiff, on behalf of Nextdoor, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants and the Sponsor for Unjust Enrichment

283.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

284.   By their wrongful acts, violations of law, and/or false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and the Sponsor were unjustly enriched at the expense of, and to the detriment of, Nextdoor.

285.   The Individual Defendants and the Sponsor either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Nextdoor that was tied to the performance or artificially inflated valuation of Nextdoor, or received compensation or other payments that were unjust in light of the Individual Defendants' and the Sponsor's bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the 2021 Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations, and the substantial sums that certain Defendants cashed out in connection with the close of the Merger.

286.   Plaintiff, as a shareholder and representative of Nextdoor, seeks restitution from the Individual Defendants and the Sponsor and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual

Defendants under the 2021 Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and the Sponsor due to their wrongful conduct and breach of their fiduciary and contractual duties.

287.   Plaintiff on behalf of Nextdoor has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants and the Sponsor for Abuse of Control

288.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

289.   The misconduct by the Individual Defendants and the Sponsor alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

290.   As a direct and proximate result of the Individual Defendants' and Sponsor's abuse of control, Nextdoor has sustained significant damages. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

291.   Plaintiff on behalf of Nextdoor has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants and the Sponsor for Gross Mismanagement

292.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

293.   By their actions alleged herein, the Individual Defendants and the Sponsor, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

294.   As a direct and proximate result of these Defendants' gross mismanagement and breaches of duty alleged herein, Nextdoor has sustained and will continue to sustain significant damages.

Verified Shareholder Derivative Complaint

295.   As a result of the misconduct and breaches of duty alleged herein, these Defendants are liable to the Company.

296.   Plaintiff on behalf of Nextdoor has no adequate remedy at law.

### SEVENTH CLAIM
**Against the Individual Defendants and the Sponsor for**
**Waste of Corporate Assets**

297.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

298.   The Individual Defendants and the Sponsor caused the Company to pay the Individual Defendants and the Sponsor excessive salaries and fees, to the detriment of the shareholders and the Company.

299.   The Individual Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of the shareholders and the Company. As noted below, certain of the Individual Defendants further aided and abetted this misconduct.

300.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and the Sponsor have caused the Company to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy Nextdoor on terms unfavorable to KV Acquisition Company II shareholders, while Legacy Nextdoor suffered from undisclosed issues and material risks. The Individual Defendants' and the Sponsor's misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend against the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

301.   As a result of the waste of corporate assets, the Individual Defendants and the Sponsor are each liable to the Company.

302.   Plaintiff, on behalf of Nextdoor, has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## EIGHTH CLAIM

**Against the Sponsor and Defendants Friar, Doyle, Khosla, Kaul, Buckland, and KV LLC for Contribution Under Section 10(b) and 21D of the Exchange Act**

303.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

304.   KV LLC, the Sponsor, and Defendants Friar, Doyle, Khosla, Kaul, and Buckland are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Sponsor's, KV LLC's, and Defendants Friar's, Doyle's, Khosla's, Kaul's, and Buckland's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

305.   The Sponsor, KV LLC, and Defendants Friar, Doyle, Khosla, Kaul, and Buckland, because of their positions of control and authority as officers and/or directors of the Company and/or Legacy Nextdoor, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

306.   Accordingly, the Sponsor, KV LLC, and Defendants Friar, Doyle, Khosla, Kaul, and Buckland are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

307.   As such, Nextdoor is entitled to receive all appropriate contribution or indemnification from the Sponsor, KV LLC, and Defendants Friar, Doyle, Khosla, Kaul, and Buckland.

Verified Shareholder Derivative Complaint

## NINTH CLAIM

**Against Defendants Friar, Doyle, Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom for Aiding and Abetting Breach of Fiduciary Duty**

308.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

309.    Defendants Friar, Doyle, Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom aided and abetted the KV Defendants who breached their fiduciary duties to the Company.

310.    Defendants Friar's, Doyle's, Bryant's, Gurley's, Kilgore's, Meeker's, Pressman's, Sze's, Tolia's, Varelas's, and Wishom's misconduct resulted in continuous, connected, and ongoing harm to the Company.

311.    Specifically, these Individual Defendants promoted the Merger by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Nextdoor's products, operations, and business prospects. Moreover, Defendants Friar, Doyle, Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom controlled and operated Legacy Nextdoor, the Company's operational predecessor, and directly made statements and/or caused Legacy Nextdoor to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects. The Individual Defendants Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom signed consent forms to become directors that were filed as exhibits to the Company's SEC filings just prior to the Merger and shareholder voting on the same, thus allowing the information pertaining to their backgrounds and qualifications to be included in the Company's Registration Statement and induce shareholders to vote in favor of the Merger and effectuate the Overpayment Misconduct to the Company's detriment.

312.    Defendants Friar, Doyle, Bryant, Gurley, Kilgore, Meeker, Pressman, Sze, Tolia, Varelas, and Wishom are jointly and severally liable to the same extent as the

Verified Shareholder Derivative Complaint

KV Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

313.   As a direct and proximate result of Friar's, Doyle's, Bryant's, Gurley's, Kilgore's, Meeker's, Pressman's, Sze's, Tolia's, Varelas's, and Wishom's aiding and abetting of the KV Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

314.   Plaintiff on behalf of Nextdoor has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Nextdoor, and that Plaintiff is an adequate representative of the Company;

(b)   Determining and awarding to Nextdoor the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(c)   Directing Nextdoor and the Individual Defendants to take all necessary actions to reform and improve Nextdoor's corporate governance and internal procedures to comply with applicable laws and to protect Nextdoor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Nextdoor to nominate at least four candidates for election to the Board;

94

Verified Shareholder Derivative Complaint

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(d)     Awarding Nextdoor restitution from Individual Defendants, and each of them;

(e)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(f)     Granting such other and further relief as the Court may deem just and proper.

<b><u>JURY TRIAL DEMANDED</u></b>

Plaintiff hereby demands a trial by jury.

Dated: July 26, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

By: */s/Robert C. Moest*
Robert C. Moest (SBN 62166)
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

**<u>VERIFICATION</u>**

I, Chenyu Wang, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of July, 2024.

*Chenyu Wang*

_____
Chenyu Wang